## CULOMBE *v.* CONNECTICUT.

No. 161.   Argued January 19, 1961.—Decided June 19, 1961.

*Alexander A. Goldfarb* argued the cause and filed a brief for petitioner.

*John D. LaBelle* argued the cause and filed a brief for respondent.

*John J. Hunt* filed a brief for the Connecticut Association for Retarded Children, as *amicus curiae,* urging reversal.

MR. JUSTICE FRANKFURTER announced the judgment of the Court and an opinion in which MR. JUSTICE STEWART joins.

Once again the Court is confronted with the painful duty of sitting in judgment on a State's conviction for murder, after a jury's verdict was found flawless by the State's highest court, in order to determine whether the

defendant's confessions, decisive for the conviction, were admitted into evidence in accordance with the standards for admissibility demanded by the Due Process Clause of the Fourteenth Amendment. This recurring problem touching the administration of criminal justice by the States presents in an aggravated form in this case the anxious task of reconciling the responsibility of the police for ferreting out crime with the right of the criminal defendant, however guilty, to be tried according to constitutional requirements.

On December 15, 1956, the dead bodies of two men were found in Kurp's Gasoline Station in New Britain, Connecticut. Edward J. Kurpiewski, the proprietor, was found in the boiler room with a bullet in his head. Daniel J. Janowski, a customer, was found in the men's toilet room shot twice in the head. Parked at the pumps in front of the station was Janowski's car. In it was Janowski's daughter, physically unharmed. She was the only surviving eyewitness of what had happened at the station. She was eighteen months old.

The Kurp's affair was one in a series of holdups and holdup killings that terrified the operators of gasoline stations, package stores and small shops throughout the environing Connecticut area. Newspapers and radio and television broadcasters reported each fresh depredation of the "mad killers." At Hartford, the State Police were at work investigating the crimes, apparently with little evidence to go on. At the scene of the killings of Kurpiewski and Janowski no physical clues were discovered.[1] The bullet slugs removed from the brains of the two victims were split and damaged.

---

[1] At the trial of petitioner and his co-defendant Taborsky for the killings at Kurp's, no evidence of any importance was presented by the State that did not derive, directly or indirectly, from the confessions and disclosures obtained from the two men during February and March 1957.

In the last week of February 1957, for reasons which do not appear in this record, suspicion in connection with at least two of the holdups under investigation, holdups of a country store in Coventry and of a package store in Rocky Hill, focused on two friends, Arthur Culombe and Joseph Taborsky. On the afternoon of February 23, the two were accosted by teams of officers and asked to come to State Police Headquarters. They were never again out of police custody. In the Headquarters' interrogation room and elsewhere, they were questioned about the Coventry and Rocky Hill holdups, Kurp's, and other matters. Within ten days Culombe had five times confessed orally to participation in the Kurp's Gasoline Station affair—once re-enacting the holdup for the police—and had signed three typed statements incriminating himself and Taborsky in the Kurp's killings. Taborsky also confessed.

The two were indicted and tried jointly for murder in the first degree before a jury in the Superior Court at Hartford. Certain of their oral and written statements were permitted to go to the jury over their timely objections that these had been extracted from them by police methods which made the confessions inadmissible consistently with the Fourteenth Amendment. Both men were convicted of first-degree murder and their convictions affirmed by the Supreme Court of Errors. 147 Conn. 194, 158 A. 2d 239. Only Culombe sought review by this Court. Because his petition for certiorari presented serious questions concerning the limitations imposed by the Federal Due Process Clause upon the investigative activities of state criminal law enforcement officials, we issued the writ. 363 U. S. 826.

I.

The occasion which in December 1956 confronted the Connecticut State Police with two corpses and an infant as their sole informants to a crime of community-disturb-

ing violence is not a rare one. Despite modern advances in the technology of crime detection, offenses frequently occur about which things cannot be made to speak. And where there cannot be found innocent human witnesses to such offenses, nothing remains—if police investigation is not to be balked before it has fairly begun—but to seek out possibly guilty witnesses and ask them questions, witnesses, that is, who are suspected of knowing something about the offense precisely because they are suspected of implication in it.

The questions which these suspected witnesses are asked may serve to clear them. They may serve, directly or indirectly, to lead the police to other suspects than the persons questioned. Or they may become the means by which the persons questioned are themselves made to furnish proofs which will eventually send them to prison or death. In any event, whatever its outcome, such questioning is often indispensable to crime detection. Its compelling necessity has been judicially recognized as its sufficient justification, even in a society which, like ours, stands strongly and constitutionally committed to the principle that persons accused of crime cannot be made to convict themselves out of their own mouths.

But persons who are suspected of crime will not always be unreluctant to answer questions put by the police. Since under the procedures of Anglo-American criminal justice they cannot be constrained by legal process to give answers which incriminate them, the police have resorted to other means to unbend their reluctance, lest criminal investigation founder.[2] Kindness, cajolery, entreaty,

---

[2] It is significant that the proposal most frequently made with the object of curbing third-degree methods by the police is the provision of some form of preliminary judicial interrogation of persons accused of crime, in which proceeding the privilege against self-incrimination is to be so far withdrawn as to permit the prosecution, upon subsequent trial of the accused, to comment on his refusal to answer questions. See IV National Commission on Law Observ-

572

deception, persistent cross-questioning, even physical brutality have been used to this end.[3]   In the United States, "interrogation" has become a police technique,[4] and detention for purposes of interrogation a common, al-

ance and Enforcement, Report No. 11, Lawlessness in Law Enforcement (hereinafter IV Wickersham) (1931), 5–6; Kauper, Judicial Examination of the Accused—A Remedy for the Third Degree, 30 Mich. L. Rev. 1224 (1932); Pound, Legal Interrogation of Persons Accused or Suspected of Crime, 24 J. Crim. L. & Criminology 1014 (1934); McCormick, Some Problems and Developments in the Admissibility of Confessions, 24 Tex. L. Rev. 239, 277 (1946).   Cf. Report of Committee on Lawless Enforcement of Law, Section of Criminal Law and Criminology of the American Bar Assn., 1 Am. J. Pol. Sci. (hereinafter ABA Committee Report) 575, 593 (1930). Underlying these proposals is the recognition that some form of interrogation of criminal suspects is necessary to effective law enforcement.

[3] For the prevalence in this country of various methods of police pressuring ranging from persistent questioning to beatings see, e. g., ABA Committee Report, passim; IV Wickersham, passim; Booth, Confessions, and Methods Employed in Procuring Them, 4 So. Calif. L. Rev. 83 (1930); Note, 43 Harv. L. Rev. 617 (1930); Hopkins, Our Lawless Police (1931), passim; Report of the President's Committee on Civil Rights, To Secure These Rights (1947), 25–27.   See also authorities cited in note 5, infra.   Although the third degree is, in England, spoken of as the American practice, England herself is not free of police interrogation and cross-questioning.   Report of the Royal Commission on Police Powers and Procedure [Cmd. 3297] (1929), 100–102; Preliminary Investigations of Criminal Offences, A Report by Justice (1960), 9–10; Williams, Questioning by the Police: Some Practical Considerations, [1960] Crim. L. Rev. 325, 328–331; Williams, Police Detention and Arrest Privileges Under Foreign Law, England, 51 J. Crim. L., Criminology & Pol. Sci. 413 (1960).   A Royal Commission is now engaged in a comprehensive inquiry concerning the police which will, apparently, include study of police methods insofar as these may relate to the control and administration of the police and their relationship with the public.   See the Commission's terms of reference, Royal Commission on the Police 1960, Interim Report [Cmd. 1222] (1960), iv.

[4] See, e. g., Kidd, Police Interrogation (1940); Mulbar, Interrogation (1951); Dienstein, Technics for the Crime Investigator (1952), 97–115; Inbau and Reid, Lie Detection and Criminal Interrogation

though generally unlawful, practice.[5] Crime detection officials, finding that if their suspects are kept under tight police control during questioning they are less likely to be distracted, less likely to be recalcitrant and, of course, less likely to make off and escape entirely, not infrequently take such suspects into custody for "investigation."

This practice has its manifest evils and dangers. Persons subjected to it are torn from the reliances of their daily existence and held at the mercy of those whose job it is—if such persons have committed crimes, as it is supposed they have—to prosecute them. They are deprived of freedom without a proper judicial tribunal having found them guilty, without a proper judicial tribunal having found even that there is probable cause to believe that they may be guilty.[6] What actually happens

(3d ed. 1953); O'Hara, Fundamentals of Criminal Investigation (1956), 95–126. Compare with the highly sophisticated methods of police interrogation described in these volumes Lord Brampton's address to Police Constables printed, in part, in Report of the Royal Commission, *supra*, note 3, Appendix 8, at 147: "Perhaps the best maxim for a constable to bear in mind with respect to an accused person is, *'Keep your eyes and your ears open, and your mouth shut.'*" See also *Regina* v. *Male and Cooper*, 17 Cox C. C. 689, 690.

[5] American Civil Liberties Union, Illinois Division, Secret Detention by the Chicago Police (1959); see also Foote, Law and Police Practice: Safeguards in the Law of Arrest, 52 Nw. U. L. Rev. 16, 20–27 (1957); Hall, The Law of Arrest in Relation to Contemporary Social Problems, 3 U. of Chi. L. Rev. 345, 359–362 (1936); Hall, Police and Law in a Democratic Society, 28 Ind. L. J. 133, 154 (1953).

[6] For a thorough discussion of the evils inherent in the detention of suspected persons for interrogation, see Memorandum on the Detention of Arrested Persons and Their Production Before a Committing Magistrate, Transmitted to Sub-committee No. 2 of the Committee on the Judiciary of the House of Representatives (1944), in Chafee, Documents on Fundamental Human Rights, Pamphlets 1–3 (1951–1952), 483. Beyond the obvious, immediate considerations concerning incarceration without judicial hearing, the threat of the third degree, deprivation of counsel at a possibly critical period in the criminal proceeding, etc., there lie other less evident but equally

to them behind the closed door of the interrogation room is difficult if not impossible to ascertain. Certainly, if through excess of zeal or aggressive impatience or flaring up of temper in the face of obstinate silence a prisoner is abused,[7] he is faced with the task of overcoming, by his lone testimony, solemn official denials.[8] The prisoner knows this—knows that no friendly or disinterested witness is present—and the knowledge may itself induce fear.[9] But, in any case, the risk is great that the police

---

significant menaces. There is the threat that a police system which has grown to rely too heavily on interrogation will not pursue, or learn, other crime detection methods, and the consequent danger that the police will feel themselves under pressure to secure confessions. See IV Wickersham, at 187–189; Glueck, Crime and Justice (1936), 76. There is the danger that the police, by offending canons of fairness regarded as fundamental by the people, will create an atmosphere of public resentment to authority inimical to law enforcement. See Hall, The Law of Arrest in Relation to Contemporary Social Problems, 3 U. of Chi. L. Rev. 345, 373 (1936); Williams, Questioning by the Police: Some Practical Considerations, [1960] Crim. L. Rev. 325, 337.

[7] See IV Wickersham, at 174: "But there is danger that the process of questioning may develop into the third degree. Once the interrogation has begun, the police or other officials are naturally reluctant to leave off until the desired information has been obtained, regardless of the prisoner's fatigue or need of sleep; and the baffled questioner, getting obstinate silence or evasive and impudent replies, is easily tempted to eke out his unsuccessful questions by threats or violence."

[8] There can be no doubt that the secrecy in which police-station interrogation is usually carried out is a condition which encourages questioning to run over into violence. See ABA Committee Report, at 587–588; Hogan and Snee, The McNabb-Mallory Rule: Its Rise, Rationale and Rescue, 47 Geo. L. J. 1, 27 (1958); cf. IV Wickersham, at 31. Historically there has been intimate connection between the use of torture and secret investigations. Filamor, Third Degree Confession, 13 Bombay L. J. 339, 342 (1936).

[9] See ABA Committee Report, at 579: ". . . [T]he prisoner knows that he is wholly at the mercy of his inquisitor and that the severe cross-examination may at any moment shift to a severe beating."

will accomplish behind their closed door precisely what the demands of our legal order forbid: make a suspect the unwilling collaborator in establishing his guilt. This they may accomplish not only with ropes and a rubber hose, not only by relay questioning persistently, insistently subjugating a tired mind, but by subtler devices.

In the police station a prisoner is surrounded by known hostile forces. He is disoriented from the world he knows and in which he finds support.[10] He is subject to coercing impingements, undermining even if not obvious pressures of every variety. In such an atmosphere, questioning that is long continued—even if it is only repeated at intervals, never protracted to the point of physical exhaustion—inevitably suggests that the questioner has a right to, and expects, an answer.[11] This is so, certainly, when the prisoner has never been told that he need not answer and when, because his commitment to custody seems to be at the will of his questioners, he has every

---

[10] See Report of the Royal Commission on Police Powers and Procedure [Cmd. 3297] (1929), at 61: ". . . [P]ersons in custody . . . are from the nature of things at a disadvantage because of their position. As one witness expressed it to us, 'the whole of the influences around them appear to them to be hostile' and we think that a right of asking questions in these circumstances is in itself a source of danger. . . ."

[11] O'Brien, J., dissenting, in *Regina* v. *Johnston,* 15 Irish Common Law Reports, 60, 87, 90 (Crim. App.): ". . . [I]t appears to me that answers given by a prisoner to questions put to him by those in whose custody he is, respecting the offence with which he is charged, cannot be regarded as voluntary statements, except the prisoner be at the same time apprised that he is not obliged to answer them, and that his answers may be given in evidence against him at his trial. The very fact of these questions being put by such a person, unaccompanied by any such caution, conveys to the prisoner's mind the idea of some obligation on his part to answer them, and deprives the statement of that voluntary character which is essential to its admissibility." Cf. Cuthbert W. Pound, Inquisitorial Confessions, 1 Cornell L. Q. 77, 80 (1916).

reason to believe that he will be held and interrogated until he speaks.[12]

However, a confession made by a person in custody is not always the result of an overborne will. The police may be midwife to a declaration naturally born of remorse, or relief, or desperation, or calculation. If that is so, if the "suction process" [13] has not been at the prisoner and drained his capacity for freedom of choice, does not the awful responsibility of the police for maintaining the peaceful order of society justify the means which they have employed? It will not do to forget, as Sir Patrick (now Lord Justice) Devlin has put it, that "The least criticism of police methods of interrogation deserves to be most carefully weighed because the evidence which such interrogation produces is often decisive; the high degree of proof which the English law requires—proof beyond reasonable doubt—often could not be achieved by the prosecution without the assistance of the accused's own statement." [14] Yet even if one cannot adopt "an undiscriminating hostility to mere interrogation . . . without unduly fettering the States in protecting society from the criminal," [15] there remain the questions: When,

---

[12] Cf. Wilde, C. J., in *Regina* v. *Pettit*, 4 Cox C. C. 164, 165: "The law is so extremely cautious in guarding against anything like torture, that it extends a similar principle to every case where a man is not a free agent in meeting an inquiry. If this sort of examination be admitted in evidence, it is hard to say where it might stop. A person in custody, or in other imprisonment, questioned by a magistrate, who has power to commit him and power to release him, might think himself bound to answer for fear of being sent to gaol. The mind in such a case would be likely to be affected by the very influences which render the statements of accused persons inadmissible." Cf. IV Wickersham, at 93.

[13] *Watts* v. *Indiana*, 338 U. S. 49, 53 (opinion of Frankfurter, J.).

[14] Devlin, The Criminal Prosecution in England (1958), 58.

[15] Jackson, J., dissenting in *Ashcraft* v. *Tennessee*, 322 U. S. 143, 156, 160.

applied to what practices, is a judgment of impermissibility drawn from the fundamental conceptions of Anglo-American accusatorial process "undiscriminating"? What are the characteristics of the "mere interrogation" which is allowable consistently with those conceptions?

## II.

The problem which must be faced in fair recognition of the States' basic security and of the States' observance of their own standards, apart from the sanctions of the Fourteenth Amendment, in bringing the guilty to justice is that which Mr. Justice Jackson described in dealing with three cases before us:

> "In each case police were confronted with one or more brutal murders which the authorities were under the highest duty to solve. Each of these murders was unwitnessed, and the only positive knowledge on which a solution could be based was possessed by the killer. In each there was reasonable ground to *suspect* an individual but not enough legal evidence to *charge* him with guilt. In each the police attempted to meet the situation by taking the suspect into custody and interrogating him . . . .

> ". . . . [N]o one suggests that any course held promise of solution of these murders other than to take the suspect into custody for questioning. The alternative was to close the books on the crime and forget it, with the suspect at large. This is a grave choice for a society in which two-thirds of the murders already are closed out as insoluble.

> .        .        .        .        .

> ". . . The suspect neither had nor was advised of his right to get counsel. This presents a real dilemma in a free society. To subject one without counsel to questioning which may and is intended to

578

convict him, is a real peril to individual freedom. To bring in a lawyer means a real peril to solution of the crime, because, under our adversary system, he deems that his sole duty is to protect his client—guilty or innocent—and that in such a capacity he owes no duty whatever to help society solve its crime problem. Under this conception of criminal procedure, any lawyer worth his salt will tell the suspect in no uncertain terms to make no statement to police under any circumstances." *Watts* v. *Indiana,* 338 U. S. 49, 57, 58–59.

The nature and components of this problem, concerning as it does liberty and security, had better be overtly and critically examined than smothered by unanalyzed assumptions. That judges who agree on relatively legal considerations may disagree in their application to the same set of circumstances does not weaken the validity of those considerations nor minimize their importance. Differences in the appraisal of the same facts is a commonplace of adjudication.

The critical elements of the problem may be quickly isolated in light of what has already been said. Its first pole is the recognition that "Questioning suspects is indispensable in law enforcement." [16] As the Supreme Court of New Jersey put it recently: "the public interest requires that interrogation, and that at a police station, not completely be forbidden, so long as it is conducted fairly, reasonably, within proper limits and with full regard to

---

[16] *People* v. *Hall,* 413 Ill. 615, 624, 110 N. E. 2d 249, 254. See 3 Wigmore on Evidence (3d ed. 1940), § 851; Filamor, Third Degree Confession, 13 Bombay L. J. 339, 347 (1936); Kidd, Police Interrogation (1940), 13–15; Mulbar, Interrogation (1951), 3–4; O'Hara, Fundamentals of Criminal Investigation (1956), 8–10; Inbau and Reid, Lie Detection and Criminal Investigation (3d ed. 1953), 195–197.

the rights of those being questioned." [17]   But if it is once admitted that questioning of suspects is permissible, whatever reasonable means are needed to make the questioning effective must also be conceded to the police.

---

[17] *State* v. *Smith*, 32 N. J. 501, 534, 161 A. 2d 520, 537.   The need to permit police interrogation of suspects in custody has been persistently asserted in this country.   See, *e. g.*, H. R. Rep. No. 1815, 85th Cong., 2d Sess. 5–7 ("If the police . . . are, in effect, prevented from conducting a proper and reasonable interrogation of suspects, law enforcement is faced with a serious challenge." *Id.*, at 5.) ; S. Rep. No. 1478, 85th Cong., 2d Sess. 7–11 ("We abhor . . . the idea . . . that the police do not have the right to reasonably interrogate persons held in custody prior to arraignment.   This subcommittee believe that the police not only have the right, but they have the duty to conduct reasonable interrogation of persons charged with crime." *Id.*, at 11.) ; H. R. Rep. No. 352, 86th Cong., 1st Sess. 4, 6–9 ("[T]o preclude police questioning would have a devastating effect on the criminal law." *Id.*, at 4.) ; Admission of Evidence in Certain Cases, Hearings before Subcommittee No. 2 of the Committee on the Judiciary, House of Representatives, on H. R. 3690, 78th Cong., 1st Sess., Ser. No. 12, 1–10, 27–60; Supreme Court Decisions, Hearings before the Special Subcommittee to Study Decisions of the Supreme Court of the United States, of the Committee on the Judiciary, House of Representatives, 85th Cong., 2d Sess., Ser. No. 12, pt. 1, 2–21, 30–101, 157–190; Admission of Evidence (Mallory Rule), Hearings before the Subcommittee on Improvements in the Federal Criminal Code of the Committee on the Judiciary, Senate, on H. R. 11477, S. 2970, S. 3325, S. 3355, 85th Cong., 2d Sess. 22–45, 64–74, 128–149, 160–162; Confessions and Police Detention, Hearings before the Subcommittee on Constitutional Rights of the Committee on the Judiciary, Senate, 85th Cong., 2d Sess. 2–8, 119–141; 93 Cong. Rec. 1390; 105 Cong. Rec. 12863; Wickersham, The Supreme Court and Federal Criminal Procedure, 44 Cornell L. Q. 14, 19–22 (1958) ; Inbau, The Confession Dilemma in the United States Supreme Court, 43 Ill. L. Rev. 442 (1948) ; Inbau, Law and Police Practice: Restrictions in the Law of Interrogation and Confessions, 52 Nw. U. L. Rev. 77, 80–82 (1957) ; Hall, Police and Law in a Democratic Society, 28 Ind. L. J. 133, 176 (1953) ; cf. IV Wickersham, at 173–174.   And see Williams, Questioning by the Police: Some Practical Considerations, [1960] Crim. L. Rev. 325, 332–334, 340–341.

Often prolongation of the interrogation period will be essential, so that a suspect's story can be checked and, if it proves untrue, he can be confronted with the lie; if true, released without charge.[18]   Often the place of questioning will have to be a police interrogation room, both because it is important to assure the proper atmosphere of privacy and non-distraction if questioning is to be made productive,[19] and because, where a suspect is questioned but not taken into custody, he—and in some cases his associates— may take prompt warning and flee the premises.   Legal counsel for the suspect will generally prove a thorough obstruction to the investigation.[20]   Indeed, even to inform the suspect of his legal right to keep silent will prove an obstruction.   Whatever fortifies the suspect or seconds him in his capacity to keep his mouth closed is a potential obstacle to the solution of crime.

---

[18] See Coakley, Law and Police Practice: Restrictions in the Law of Arrest, 52 Nw. U. L. Rev. 2, 8–10 (1957), criticizing as possibly too short, in some cases, the twenty-four-hour maximum prehearing detention period provided by § 11 of the Uniform Arrest Act.   The Act is found in Warner, The Uniform Arrest Act, 28 Va. L. Rev. 315, 343, 347 (1942).

[19] See Mulbar, Interrogation (1951), 18–19.

[20] See Confessions and Police Detention, Hearings, *supra,* note 17, at 117–118; H. R. Rep. No. 352, 86th Cong., 1st Sess. 8.   See also Kauper, Judicial Examination of the Accused—A Remedy for the Third Degree, 30 Mich. L. Rev. 1224, 1247 (1932), suggesting that the presence of counsel would be obstructive even at an interrogation where the accused was deprived of his privilege against self-incrimination.   It is significant that critics of French criminal procedure attribute the presence of third-degree methods and extra-judicial police interrogation in France to the impediment to judicial inquisition introduced by the law of 1897, giving suspects the right to be represented by counsel before the *juge d'instruction.*   Hamson, The Prosecution of the Accused—English and French Legal Methods, [1955] Crim. L. Rev. 272, 275–276, 278; Vouin, The Protection of the Accused in French Criminal Procedure, 5 Int'l & Comp. L. Q. 1, 17 (1956).

At the other pole is a cluster of convictions each expressive, in a different manifestation, of the basic notion that the terrible engine of the criminal law is not to be used to overreach individuals who stand helpless against it.[21] Among these are the notions that men are not to be imprisoned at the unfettered will of their prosecutors, nor subjected to physical brutality by officials charged with the investigation of crime. Cardinal among them, also, is the conviction, basic to our legal order, that men are not to be exploited for the information necessary to condemn them before the law, that, in Hawkins' words, a prisoner is not "to be made the deluded instrument of his own conviction." 2 Hawkins, Pleas of the Crown (8th ed. 1824), 595. This principle, branded into the consciousness of our civilization by the memory of the secret inquisitions, sometimes practiced with torture, which were borrowed briefly from the continent during the era of the Star Chamber,[22] was well known to those who established the American governments.[23] Its essence is the require-

---

[21] These involve, as Sir Patrick Devlin put it, "the recognition, by every system of law in which the liberty of the subject is considered, that inquiry into crime cannot be left simply to administrative discretion. In most systems it has been found necessary to regulate, formally or informally, the power of interrogation." Devlin, The Criminal Prosecution in England (1958), 13–14.

[22] For the history of this episode in English judicial practice see 5 Holdsworth, A History of English Law (1924), 184–196; Lowell, The Judicial Use of Torture, 11 Harv. L. Rev. 220, 290 (1897).

[23] Patrick Henry, in 3 Elliot's Debates (2d ed. 1891), 447–448: ". . . What has distinguished our ancestors?—That they would not admit of tortures, or cruel and barbarous punishment. But [in the absence of a Bill of Rights] Congress may introduce the practice of the civil law, in preference to that of the common law. They may introduce the practice of France, Spain, and Germany—of torturing, to extort a confession of the crime. They will say that they might as well draw examples from those countries as from Great Britain, and they will tell you that there is such a necessity of strengthening the arm of government, that they must have a criminal

ment that the State which proposes to convict and punish an individual produce the evidence against him by the independent labor of its officers, not by the simple, cruel expedient of forcing it from his own lips. See *Blackburn* v. *Alabama,* 361 U. S. 199, 206–207; *Chambers* v. *Florida,* 309 U. S. 227, 235–238. Quite early the English courts acknowledged the barrier that, in this regard, set off the accusatorial system from the inquisitorial.[24] And soon

equity, and extort confession by torture, in order to punish with still more relentless severity. We are then lost and undone."

[24] See Gilbert on Evidence (3d ed. 1769) 140: ". . . but then this Confession must be voluntary and without Compulsion; for our Law in this differs from the Civil Law, that it will not force any Man to accuse himself; and in this we do certainly follow the Law of Nature, which commands every Man to endeavor his own Preservation; and therefore Pain and Force may compel Men to confess what is not the Truth of Facts, and consequently such extorted Confessions are not to be depended on." And see *Brown* v. *Walker,* 161 U. S. 591, 596–597; 1 Cooley's Constitutional Limitations (8th ed. 1927) 647–648; cf. 2 Story on the Constitution (4th ed. 1873) § 1788. Of course, the continental countries which employ inquisitorial modes of criminal procedure have themselves long ago given up reliance upon the tortures which they once used to wring incriminating information out of the accused and which were a salient feature of the inquisitorial system at the time that the English definitely rejected it in the seventeenth century. For descriptions of the development and modern character of the inquisitorial method, see Keedy, The Preliminary Investigation of Crime in France, 88 U. of Pa. L. Rev. 385, 692, 915 (1940); Garner, Criminal Procedure in France, 25 Yale L. J. 255 (1916); Ploscowe, The Development of Present-Day Criminal Procedures in Europe and America, 48 Harv. L. Rev. 433 (1935); Hamson, The Prosecution of the Accused—English and French Legal Methods, [1955] Crim. L. Rev. 272; and see Vouin, Provisional Release in French Penal Law, 108 U. of Pa. L. Rev. 355 (1960). A description of the careful procedural safeguards which the inquisitorial system now maintains is found in Vouin, The Protection of the Accused in French Criminal Procedure, 5 Int'l & Comp. L. Q. 1 (1956), and an interesting study of some of those safeguards in operation in a particular case is Vouin, L'Affaire Drummond, [1955] Crim. L. Rev. 5.

they came to enforce it by the rigorous demand that an extra-judicial confession, if it was to be offered in evidence against a man, must be the product of his own free choice.[25] So fundamental, historically, is this concept, that the

[25] *Rex* v. *Rudd,* 1 Cowp. 331, 334. See *Ibrahim* v. *Rex,* [1914] A. C. 599, 609–610 (P. C.). Wigmore, it is true, attributes to the English exclusionary rule the sole purpose of assuring the reliability of evidence. See 3 Wigmore on Evidence (3d ed. 1940) §§ 815–867. There can be no doubt, of course, that the fear of false confessions played a large part in the adoption of the rule. See *Rex* v. *Warickshall,* 1 Leach 298, 299–300; 3 Russell on Crimes (6th ed. 1896) 478, n. (e). But it is equally clear that there soon mingled with this original and at first exclusive impetus another independent and sufficient, although historically diverse, reason for the rule: the conception that the use of extorted confessions set at naught the underlying tenet of the accusatorial system, that men might not be compelled to speak what would convict them. See Gilbert on Evidence, quoted note 24, *supra.* Quite apart from testimonial unreliability, where it appeared that coercion had been applied to extract extra-judicial incriminating statements, the courts refused to be party to such proceedings. *Regina* v. *Jarvis,* 10 Cox C. C. 574, 576 (Crim. App.); *Regina* v. *Thompson,* [1893] 2 Q. B. 12, 18–19 (Cr. Cas. Res.); *Chalmers* v. *H. M. Advocate,* [1954] Sess. Cas. 66, 78–79, 81–82 (J. C.); O'Brien, J., dissenting in *Regina* v. *Johnston,* 15 Irish Common Law Reports 60, 87, 88. Compare *Bram* v. *United States,* 168 U. S. 532, 543. And see McCormick, The Scope of Privilege in the Law of Evidence, 16 Tex. L. Rev. 447, 451–457 (1938); Smith, Public Interest and the Interests of the Accused in the Criminal Process—Reflections of a Scottish Lawyer, 32 Tulane L. Rev. 349, 354–355 (1958); Lowell, The Judicial Use of Torture, 11 Harv. L. Rev. 220, 290, 296 (1897). In this way, the conceptions underlying the rule excluding coerced confessions and the privilege against self-incrimination have become, to some extent, assimilated. See 1 Stephen, A History of the Criminal Law of England (1883), 440; 1 Taylor on Evidence (12th ed. 1931) 556; Fraenkel, From Suspicion to Accusation, 51 Yale L. J. 748, 753 (1942); Report of the Royal Commission on Police Powers and Procedures [Cmd. 3297] (1929) 24; IV Wickersham, at 26–27. Our own decisions enforcing the Due Process Clause of the Fourteenth Amendment have made clear that "The aim of the requirement of due process is not to exclude presumptively

Fourteenth Amendment, as enforced by our decisions, applied it as a limitation upon the criminal procedure of the States. Consistently with that Amendment neither the body nor mind of an accused may be twisted until he breaks. *Brown* v. *Mississippi,* 297 U. S. 278; *Leyra* v. *Denno,* 347 U. S. 556.

Recognizing the need to protect criminal suspects from all of the dangers which are to be feared when the process of police interrogation is entirely unleashed, legislatures have enacted several kinds of laws designed to curb the worst excesses of the investigative activity of the police. The most widespread of these are the ubiquitous statutes requiring the prompt taking of persons arrested before a judicial officer; [26] these are responsive both to the fear

false evidence, but to prevent fundamental unfairness in the use of evidence, whether true or false." *Lisenba* v. *California,* 314 U. S. 219, 236. See *Rogers* v. *Richmond,* 365 U. S. 534, and authorities cited therein. And see *State* v. *Smith,* 32 N. J. 501, 541–544, 161 A. 2d 520, 541–543 (1960).

[26] See *McNabb* v. *United States,* 318 U. S. 332, 342–343, n. 7. The most prevalent American provision is that requiring judicial examination "without unnecessary delay." See, *e. g.,* Fed. Rules Crim. Proc., 5 (a); Cal. Penal Code, § 849; Ill. Rev. Stat., 1959, c. 38, § 660; N. Y. Code Crim. Proc., § 165; American Law Institute, Code Crim. Proc., 1931, §§ 6, 35; and see 1 Alexander, The Law of Arrest (1949), 623–633. Some jurisdictions fix specific periods of permissible pre-examination detention. See Cal. Penal Code, § 825 (without unnecessary delay; two-day maximum); Mo. Rev. Stat., 1959, § 544.170 (twenty hours unless prisoner charged and held by warrant); N. H. Rev. Stat., 1955, §§ 594:2, 594:19, 594:20, 594:22, 594:23 (four-hour detention without arrest in certain cases; twenty-four hours after night arrest; examination without unreasonable delay if arrest is by warrant; other arrests require prompt examination; twenty-four-hour maximum); R. I. Gen. Laws, 1956, §§ 12–7–1, 12–7–13 (two-hour detention without arrest in certain cases; twenty-four hours after arrest). Judicial decisions as to what constitutes unnecessary or unreasonable delay, under the pertinent statutes or at common law, are not wholly harmonious. Compare *Keefe* v. *Hart,*

of administrative detention without probable cause and
to the known risk of opportunity for third-degree prac-
tices which is allowed by delayed judicial examination.[27]
Other statutes outlaw the sweating, beating or imprison-

213 Mass. 476, 100 N. E. 558 (jury could find one and a quarter hours
unlawful), with *Lynn* v. *Weaver*, 251 Mich. 265, 231 N. W. 579 (four
hours lawful); *Madsen* v. *Hutchison*, 49 Idaho 358, 290 P. 208 (five
hours unlawful as matter of law; no extenuating circumstances found),
with *Haggard* v. *First Nat. Bank of Mandan*, 72 N. D. 434, 8 N. W. 2d
5 (jury can find five hours lawful under circumstances); *Dragna* v.
*White*, 45 Cal. 2d 469, 473, 289 P. 2d 428, 430 (dictum that less than
two days may be unlawful under Cal. Penal Code, § 825), with
*People* v. *Sewell*, 95 Cal. App. 2d 850, 856, 214 P. 2d 113, 117 (sug-
gestion that two-day detention is lawful under § 825; no considera-
tion of circumstances). Cases can be found holding necessary or
reasonable relatively long periods of delay. *E. g., People* v. *Kelly*,
404 Ill. 281, 288, 89 N. E. 2d 27, 30–31, *semble; Commonwealth* v.
*Banuchi*, 335 Mass. 649, 141 N. E. 2d 835; *Mulberry* v. *Fuellhart*,
203 Pa. 573, 53 A. 504; *Peloquin* v. *Hibner*, 231 Wis. 77, 285 N. W.
380 (alternative holding); *United States ex rel. Goodchild* v. *Burke*,
245 F. 2d 88 (C. A. 7th Cir.) (Wisconsin law). But see *Mallory* v.
*United States*, 354 U. S. 449.

Outside the United States, too, legislation requiring that arrested
persons be brought before a magistrate within some fixed period of
time is common, although the period fixed varies from country to
country. See, *e. g.*, Criminal Code of Canada, § 438 (2) (twenty-four
hours whenever a justice is available within twenty-four hours; if
not, as soon thereafter as possible); Magistrates' Courts Act,
1952, 15 & 16 Geo. VI & 1 Eliz. II, c. 55, § 38 (police must release
on recognizance persons arrested without warrant who cannot prac-
ticably be brought before a magistrate within twenty-four hours,
unless the offense is serious); Criminal Procedure (Scotland) Act,
1887, 50 & 51 Vict., c. 35, § 17 (examination on declaration may be
delayed forty-eight hours to permit person arrested to secure coun-
sel); compare the new French Code de Procédure Pénale, Arts.
63, 77, 154 (twenty-four-hour detentions for investigation in certain
cases). For discussion of such foreign regulations, see Working
Papers E through V, United Nations, 1958 Seminar on the Protection
of Human Rights in Criminal Law and Procedure, Baguio City, Philip-

ment of suspects for the purpose of extorting confessions,[28] or assure imprisoned suspects the right to communicate with friends or legal counsel.[29] But because it is the courts which are charged, in the ultimate, both with the

---

pines (1958), and the Symposium: The Comparative Study of Conditional Release, 108 U. of Pa. L. Rev. 290–365 (1960).

In sum, it seems fair to say that there is unanimity for the proposition that "Strict observance of some reasonably definite and rather short time-limit for the detention of a prisoner after arrest without judicial sanction is vital to personal liberty." Statement by the Committee on the Bill of Rights of the American Bar Assn., Submitted to Subcommittee No. 2 of the Committee on the Judiciary, House of Representatives, in Chafee, Documents on Fundamental Human Rights, Pamphlets 1–3 (1951–1952), 480. But there is wide divergence of views concerning how definite is "reasonably definite" and how short is "rather short."

[27] Instances of third-degree treatment of prisoners almost invariably occur during the period between arrest and preliminary examination. IV Wickersham, at 169; Annual Report of the Committee on Criminal Courts, Law and Procedure for 1927–1928 to the Association of the Bar of the City of New York, Year Book, 1928, of the Assn. of the Bar, City of New York 235, 243, 253; Leibowitz, Law and Police Practice: Safeguards in the Law of Interrogation and Confessions, 52 Nw. U. L. Rev. 86, 87 (1957); Hall, The Law of Arrest in Relation to Contemporary Social Problems, 3 U. of Chi. L. Rev. 345, 357 (1936).

[28] *E. g.*, Ill. Rev. Stat., 1959, c. 38, § 379 (penalizing assault and battery or imprisonment by two or more persons for the purpose of obtaining confessions); Ky. Rev. Stat., 1960, § 422.110 (penalizing attempts by persons having custody of prisoners charged with crime to obtain incriminating information by plying with questions, by threats or by other wrongful means; confession so obtained made inadmissible in evidence).

[29] *E. g.*, Cal. Penal Code, § 825 (attorneys permitted to see arrested persons; officers neglecting or refusing to permit such visits are guilty of a misdemeanor and civilly liable for statutory forfeiture); N. H. Rev. Stat., 1955, §§ 594:15, 594:16, 594:17 (relatives, friends and attorney to be notified of arrest and permitted to see person arrested; violation of these provisions made criminal); Tex. Penal Code, Art. 1176 (makes it unlawful for persons having prisoners in

enforcement of the criminal law and with safeguarding the criminal defendant's rights to procedures consistent with fundamental fairness, the problem of reconciling society's need for police interrogation with society's need for protection from the possible abuses of police interrogation decisively devolves upon the courts, particularly in connection with the rules of evidence which regulate the admissibility of extrajudicial confessions. Under our federal system this task, with respect to local crimes, is, of course, primarily the responsibility of the state courts. The Fourteenth Amendment, however, limits their freedom in this regard. It subjects their broad powers to a limited, but searching, federal review and places upon this Court the obligation—with all the deference and caution which exercise of such a competence demands—to adjudicate what due process of law requires by way of restricting the state courts in their use of the products of police interrogation.

That judgment is what is at issue in this case.

## III.

The dilemma posed by police interrogation of suspects in custody and the judicial use of interrogated confessions to convict their makers cannot be resolved simply by wholly subordinating one set of opposing considerations to the other. The argument that without such interrogation it is often impossible to close the hiatus between suspicion and proof, especially in cases involving professional criminals, is often pressed in quarters responsible and not unfeeling. It is the same argument that

---

custody to prevent prisoners' consultation or communication with counsel). For citation to statutes employing various approaches to elimination of third-degree practices and the protection of prisoners' interests, see McCormick, Some Problems and Developments in the Admissibility of Confessions, 24 Tex. L. Rev. 239, 251–254 (1946).

was once invoked to support the lash and the rack.[30] Where it has been put to this Court in its extreme form, as justifying the all-night grilling of prisoners under circumstances of sustained, week-long terror, we have rejected it. *Chambers* v. *Florida,* 309 U. S. 227, 240–241. "The Constitution proscribes such lawless means irrespective of the end."

But asking questions is not the lash or the rack, and to say that the argument *ex necessitate* is not the short answer to every situation in which it is invoked is not to dismiss it altogether. Due process does not demand of the States, in their administration of the criminal law, standards of favor to the accused which our civilization, in its most sensitive expression, has never found it practical to adopt. The principle of the Indian Evidence Act which excludes all confessions made to the police or by persons while they are detained by the police [31] has never been accepted in England [32] or in

---

[30] Under the inquisitorial system as it was practiced with systematized torture (the system embodied, for example, in the French Ordinance of 1670), the rack was applied to suspects in whose cases the preliminary examination had developed indications of guilt sufficient to justify its use but insufficient to satisfy the severe burden of proof necessary to conviction. See Lowell, The Judicial Use of Torture, 11 Harv. L. Rev. 220, 224–228 (1897).

[31] The Indian Evidence Act, 1872. Section 25 excludes confessions made to a police officer; § 26 excludes confessions made by any person while in the custody of a police officer, except in the immediate presence of a magistrate. However, § 27 provides that "when any fact is deposed to as discovered in consequence of information received from a person accused of any offence, in the custody of a police-officer, so much of such information, whether it amounts to a confession or not, as relates distinctly to the fact thereby discovered, may be proved." Compare the bill, reported to have passed one house of the California Legislature in 1929, set out in Booth, Confessions, and Methods Employed in Procuring Them, 4 So. Calif. L. Rev. 83, 84–85, n. 3a (1930). And see the provision submitted without rec-

this country.[33]   Nor has the principle of the Scottish cases barring the use in evidence of a defendant's incriminating responses to police questioning at any time after suspicion has ·focused on him.[34]   Rather, this Court (in cases coming here from the lower federal courts),[35] the courts of England[36] and of Canada,[37] and

ommendation by the Commission on Penal Procedure at the Sixth Congress of the International Association of Democratic Lawyers, in Coe, Practices of Police and Prosecution Prior to Trial, 17 Law. Guild Rev. 62, 64 (1957).

[32] *E. g., Ibrahim* v. *Rex,* [1914] A. C. 599 (P. C.) ; *Regina* v. *May,* 36 Cr. App. Rep. 91.

[33] *Hopt* v. *Utah,* 110 U. S. 574; *Sparf and Hansen* v. *United States,* 156 U. S. 51; *Pierce* v. *United States,* 160 U. S. 355.   And see *Wilson* v. *United States,* 162 U. S. 613, 623; *Bilokumsky* v. *Tod,* 263 U. S. 149, 157.

[34] *Chalmers* v. *H. M. Advocate,* [1954] Sess. Cas. 66 (J. C.).   As expressed in the opinion of the Lord Justice-General,

". . . The theory of our law is that at the stage of initial investigation the police may question anyone with a view to acquiring information which may lead to the detection of the criminal; but that, when the stage has been reached at which suspicion, or more than suspicion, has in their view centred upon some person as the likely perpetrator of the crime, further interrogation of that person becomes very dangerous, and, if carried too far, *e. g.,* to the point of extracting a confession by what amounts to cross-examination, the evidence of that confession will almost certainly be excluded."   *Id.,* at 78.

[35] *United States* v. *Carignan,* 342 U. S. 36; cf. *United States* ·v. *Mitchell,* 322 U. S. 65.   And see *Bram* v. *United States,* 168 U. S. 532, 558; *Ziang Sung Wan* v. *United States,* 266 U. S. 1, 14; *McNabb* v. *United States,* 318 U. S. 332, 346.

[36] *Rex* v. *Thornton,* 1 Mood. 27; *Rex* v. *Gilham,* 1 Mood. 186; *Rex* v. *Voisin,* [1918] 1 K. B. 531 (Crim. App.) ; *Regina* v. *Straffen,* [1952] 2 Q. B. 911 (Crim. App.) ; and see *Lambe's Case,* 2 Leach 552, 554.   Irish courts reach the same result.   *Rex* v. *Gibney,* Jebb's Res. Cas. 14; *Regina* v. *Johnston,* 15 Irish Common Law Rep. 60 (Crim. App.).   Several English decisions at the end of the last century appeared to lay down a *per se* rule excluding confessions by persons questioned in custody, see *Regina* v. *Gavin,* 15 Cox C. C.

590

the courts of all the States [38] have agreed in holding permissible the receipt of confessions secured by the questioning of suspects in custody by crime-detection officials. And, in a long series of cases, this Court has held that the

656; *Regina* v. *Male and Cooper,* 17 Cox C. C. 689, but these cases have since been laid to rest. *Rex* v. *Best,* [1909] 1 K. B. 692 (Crim. App.). Perhaps the best statement of the current English law, subject to some qualification with respect to the Judges' Rules, see text at notes 39–47, *infra,* is that in *Rex* v. *Voisin,* [1918] 1 K. B. 531, 539 (Crim. App.):

". . . [T]he mere fact that a statment is made in answer to a question put by a police constable is not in itself sufficient to make the statement inadmissible in law. It may be, and often is, a ground for the judge in his discretion excluding the evidence; but he should do so only if he thinks the statement was not a voluntary one . . . , or was an unguarded answer made under circumstances that rendered it unreliable, or unfair for some reason to be allowed in evidence against the prisoner." See *Ibrahim* v. *Rex,* [1914] A. C. 599, 610–614 (P. C.).

[37] *Boudreau* v. *Rex,* [1949] 3 D. L. R. 81 (S. C. Can.); *Rex* v. *Bellos,* [1927] 3 D. L. R. 186 (S. C. Can.); *Regina* v. *Day,* 20 Ont. 209 (Q. B.); *Regina* v. *Elliott,* 31 Ont. 14 (D. C.). In Canada, as in England, however, trial judges exercise a broad discretion to exclude confessions by prisoners in response to police questioning where, under all the circumstances, admission of the confessions is deemed unfair. See *Rex* v. *Anderson,* [1942] 3 D. L. R. 179 (C. A., B. C.). Compare *Rex* v. *Kooten,* [1926] 4 D. L. R. 771 (K. B., Man.), with the Canadian cases cited in notes 47 and 48, *infra.* And in both countries the heavy burden placed on the Crown affirmatively to demonstrate the voluntariness of any offered statement as a condition of its admissibility, *Regina* v. *Thompson,* [1893] 2 Q. B. 12 (Cr. Cas. Res.), often operates to exclude interrogated confessions. See, *e. g., Rex* v. *Chadwick,* 24 Crim. App. Rep. 138 (Recorder erred in determining issue of voluntariness on depositions; burden is on Crown affirmatively to show that confession is voluntary); *Rex* v. *Dick,* [1947] 2 D. L. R. 213 (C. A., Ont.); *Rex* v. *Howlett,* [1950] 2 D. L. R. 517 (C. A., Ont.). The Canadian law is discussed in Kaufman, The Admissibility of Confessions in Criminal Matters (1960).

[38] Alabama: *Ingram* v. *State,* 252 Ala. 497, 42 So. 2d 36 (1949); *Myhand* v. *State,* 259 Ala. 415, 66 So. 2d 544 (1953). Arizona: *State* v. *Miller,* 62 Ariz. 529, 158 P. 2d 669 (1945); *Hightower* v. *State,* 62

Fourteenth Amendment does not prohibit a State from such detention and examination of a suspect as, under all the circumstances, is found not to be coercive. See *Lisenba* v. *California,* 314 U. S. 219; *Lyons* v. *Oklahoma,*

Ariz. 351, 158 P. 2d 156 (1945), *semble; State* v. *Jordan,* 83 Ariz. 248, 320 P. 2d 446 (1958), *semble.* Arkansas: *State* v. *Browning,* 206 Ark. 791, 178 S. W. 2d 77 (1944); *Moore* v. *State,* 229 Ark. 335, 315 S. W. 2d 907 (1958); and see *Dorsey* v. *State,* 219 Ark. 101, 240 S. W. 2d 30 (1951). California: *People* v. *Bashor,* 48 Cal. 2d 763, 312 P. 2d 255 (1957); and see *Rogers* v. *Superior Court,* 46 Cal. 2d 3, 291 P. 2d 929 (1955). Colorado: *Cahill* v. *People,* 111 Colo. 29, 137 P. 2d 673 (1943); *Downey* v. *People,* 121 Colo. 307, 215 P. 2d 892 (1950); *Leick* v. *People,* 136 Colo. 535, 322 P. 2d 674 (1958). Connecticut: *State* v. *Zukauskas,* 132 Conn. 450, 45 A. 2d 289 (1945); *State* v. *Buteau,* 136 Conn. 113, 68 A. 2d 681 (1949); and see *State* v. *Guastamachio,* 137 Conn. 179, 75 A. 2d 429 (1950). Delaware: *Garner* v. *State,* 51 Del. 301, 145 A. 2d 68 (1958). Florida: *Graham* v. *State,* 91 So. 2d 662 (Fla. 1956); *Singer* v. *State,* 109 So. 2d 7, 26 (Fla. 1959); and see *Finley* v. *State,* 153 Fla. 394, 14 So. 2d 844 (1943); *Rollins* v. *State,* 41 So. 2d 885 (Fla. 1949). Georgia: *Bryant* v. *State,* 191 Ga. 686, 13 S. E. 2d 820 (1941), 197 Ga. 641, 30 S. E. 2d 259 (1944); *Russell* v. *State,* 196 Ga. 275, 26 S. E. 2d 528 (1943); and see *Ferguson* v. *State,* 215 Ga. 117, 109 S. E. 2d 44 (1959), rev'd on other grounds, 365 U. S. 570. Hawaii: *Territory* v. *Young and Nozawa,* 37 Haw. 189 (1945); *Territory* v. *Aquino,* 43 Haw. 347 (1959). Idaho: *State* v. *Behler,* 65 Idaho 464, 146 P. 2d 338 (1944), *semble;* and see *State* v. *Johnson,* 74 Idaho 269, 261 P. 2d 638 (1953). Illinois: *People* v. *Lazenby,* 403 Ill. 95, 85 N. E. 2d 660 (1949); *People* v. *Hall,* 413 Ill. 615, 110 N. E. 2d 249 (1953); *Davies* v. *People,* 10 Ill. 2d 11, 139 N. E. 2d 216 (1956); *People* v. *Goard,* 11 Ill. 2d 495, 144 N. E. 2d 603 (1957); *Napue* v. *People,* 13 Ill. 2d 566, 571, 150 N. E. 2d 613, 616 (1958) (dictum), rev'd on other grounds, 360 U. S. 264; *People* v. *Miller,* 13 Ill. 2d 84, 148 N. E. 2d 455 (1958); and see *People* v. *Lettrich,* 413 Ill. 172, 108 N. E. 2d 488 (1952). Indiana: *Krauss* v. *State,* 229 Ind. 625, 100 N. E. 2d 824 (1951); *Pearman* v. *State,* 233 Ind. 111, 117 N. E. 2d 362 (1954); and see *Davis* v. *State,* 235 Ind. 620, 137 N. E. 2d 30 (1956). Iowa: *State* v. *Williams,* 245 Iowa 494, 62 N. W. 2d 742 (1954); *State* v. *Harriott,* 248 Iowa 25, 79 N. W. 2d 332 (1956); *State* v. *Triplett,* 248 Iowa 339, 79 N. W. 2d 391 (1956). Kansas: *State* v. *Vargas,* 180 Kan. 716, 308 P. 2d 81

322 U. S. 596; *Gallegos* v. *Nebraska,* 342 U. S. 55; *Brown* v. *Allen,* 344 U. S. 443; *Stein* v. *New York,* 346 U. S. 156, 184; *Crooker* v. *California,* 357 U. S. 433; *Cicenia* v. *Lagay,* 357 U. S. 504. And see *Townsend* v. *Burke,* 334 U. S. 736, 738.

(1957); and see *State* v. *Smith,* 158 Kan. 645, 149 P. 2d 600 (1944). Kentucky: *Commonwealth* v. *Mayhew,* 297 Ky. 172, 178 S. W. 2d 928 (1943); *Curtis* v. *Commonwealth,* 312 Ky. 205, 226 S. W. 2d 753 (1949); *Reed* v. *Commonwealth,* 312 Ky. 214, 226 S. W. 2d 513 (1949); *Milam* v. *Commonwealth,* 275 S. W. 921 (Ky. 1955); *Karl* v. *Commonwealth,* 288 S. W. 2d 628 (Ky. 1956). Louisiana: *State* v. *Holmes,* 205 La. 730, 18 So. 2d 40 (1944); *State* v. *Joseph,* 217 La. 175, 46 So. 2d 118 (1950); *State* v. *Solomon,* 222 La. 269, 62 So. 2d 481 (1952); *State* v. *Weston,* 232 La. 766, 95 So. 2d 305 (1957); and see *State* v. *Green,* 221 La. 713, 60 So. 2d 208 (1952). Maine: *State* v. *Priest,* 117 Me. 223, 103 A. 359 (1918). Maryland: *Cox* v. *State,* 192 Md. 525, 64 A. 2d 732 (1949); *James* v. *State,* 193 Md. 31, 65 A. 2d 888 (1949); *Merchant* v. *State,* 217 Md. 61, 141 A. 2d 487 (1958). Massachusetts: *Commonwealth* v. *Mabey,* 299 Mass. 96, 12 N. E. 2d 61 (1937); *Commonwealth* v. *Banuchi,* 335 Mass. 649, 141 N. E. 2d 835 (1957). Michigan: *People* v. *La Panne,* 255 Mich. 38, 237 N. W. 38 (1931), *semble;* and see *People* v. *Hamilton,* 359 Mich. 410, 416–417, 102 N. W. 2d 738 (1960). Minnesota: *State* v. *Schabert,* 222 Minn. 261, 24 N. W. 2d 846 (1946). Mississippi: *Winston* v. *State,* 209 Miss. 799, 48 So. 2d 513 (1950), *semble; Crouse* v. *State,* 229 Miss. 15, 89 So. 2d 919 (1956), *semble.* Missouri: *State* v. *Ellis,* 354 Mo. 998, 193 S. W. 2d 31 (1946); *State* v. *Francies,* 295 S. W. 2d 8 (Mo. 1956); *State* v. *Smith,* 310 S. W. 2d 845 (Mo. 1958); and see *State* v. *Lee,* 361 Mo. 163, 233 S. W. 2d 666 (1950). Montana: *State* v. *Dixson,* 80 Mont. 181, 260 P. 138 (1927); *State* v. *Robuck,* 126 Mont. 302, 248 P. 2d 817 (1952). Nebraska: *Kitts* v. *State,* 151 Neb. 679, 39 N. W. 2d 283 (1949); *Gallegos* v. *State,* 152 Neb. 831, 43 N. W. 2d 1 (1950), aff'd, 342 U. S. 55; *Parker* v. *State,* 164 Neb. 614, 83 N. W. 2d 347 (1957). Nevada: *State* v. *Boudreau,* 67 Nev. 36, 214 P. 2d 135 (1950); *Ex parte Sefton,* 73 Nev. 2, 306 P. 2d 771 (1957). New Hampshire: *State* v. *Howard,* 17 N. H. 171 (1845); and see *State* v. *George,* 93 N. H. 408, 43 A. 2d 256 (1945). New Jersey: *State* v. *Pierce,* 4 N. J. 252, 72 A. 2d 305 (1950); *State* v. *Cooper,* 10 N. J. 532, 92 A. 2d 786 (1952); *State* v. *Grillo,* 11 N. J. 173, 93 A. 2d 328 (1952); *State* v. *Wise,* 19 N. J. 59, 115 A. 2d 62 (1955); *State* v. *Smith,* 32 N. J. 501, 161 A. 2d 520 (1960). New

It is true that the English courts have long tended severely to discourage law enforcement officers from asking questions of persons under arrest or who are so far suspected that their arrest is imminent. The judges have

Mexico: *State* v. *Lindemuth,* 56 N. M. 257, 243 P. 2d 325 (1952); *State* v. *Griego,* 61 N. M. 42, 294 P. 2d 282 (1956); *State* v. *Padilla,* 66 N. M. 289, 347 P. 2d 312 (1959). New York: *People* v. *Perez,* 300 N. Y. 208, 90 N. E. 2d 40 (1949); *People* v. *Spano,* 4 N. Y. 2d 256, 150 N. E. 2d 226 (1958), rev'd, 360 U. S. 315; *People* v. *Vargas,* 7 N. Y. 2d 555, 166 N. E. 2d 831 (1960); and see *People* v. *Alex,* 265 N. Y. 192, 192 N. E. 289 (1934); *People* v. *Elmore,* 277 N. Y. 397, 14 N. E. 2d 451 (1938); *People* v. *Lovello,* 1 N. Y. 2d 436, 136 N. E. 2d 483 (1956). But see *People* v. *Di Biasi,* 7 N. Y. 2d 544, 166 N. E. 2d 825 (1960) (post-indictment). North Carolina: *State* v. *Brown,* 233 N. C. 202, 63 S. E. 2d 99 (1951); *State* v. *Rogers,* 233 N. C. 390, 64 S. E. 2d 572 (1951); *State* v. *Davis,* 253 N. C. 86, 116 S. E. 2d 365 (1960). North Dakota: *State* v. *Nagel,* 75 N. D. 495, 28 N. W. 2d 665 (1947); *State* v. *Braathen,* 77 N. D. 309, 43 N. W. 2d 202 (1950). Ohio: *State* v. *Collett,* 58 N. E. 2d 417 (Ohio App. 1944), app. dism'd, 144 Ohio St. 639, 60 N. E. 2d 170 (1945); *State* v. *Lowder,* 79 Ohio App. 237, 72 N. E. 2d 785 (1946), app. dism'd, 147 Ohio St. 530, 72 N. E. 2d 102 (1947). Oklahoma: *Fry* v. *State,* 78 Okla. Cr. 299, 147 P. 2d 803 (1944); *Hendrickson* v. *State,* 93 Okla. Cr. 379, 229 P. 2d 196 (1951); *Thacker* v. *State,* 309 P. 2d 306 (Okla. Cr., 1957); and see *Application of Fowler,* 356 P. 2d 770, 778 (Okla. Cr., 1960). Oregon: *State* v. *Folkes,* 174 Ore. 568, 150 P. 2d 17 (1944); *State* v. *Nunn,* 212 Ore. 546, 321 P. 2d 356 (1958); and see *State* v. *Leland,* 190 Ore. 598, 227 P. 2d 785 (1951), aff'd, 343 U. S. 790 (1952). Pennsylvania: *Commonwealth* v. *Agoston,* 364 Pa. 464, 72 A. 2d 575 (1950); *Commonwealth* v. *Bibalo,* 375 Pa. 257, 100 A. 2d 45 (1953); *Commonwealth ex rel. Sleighter* v. *Banmiller,* 392 Pa. 133, 139 A. 2d 918 (1958). Rhode Island: *State* v. *Andrews,* 86 R. I. 341, 134 A. 2d 425 (1957). South Carolina: *State* v. *Brown,* 212 S. C. 237, 47 S. E. 2d 521 (1948); *State* v. *Bullock,* 235 S. C. 356, 111 S. E. 2d 657 (1959); and see *State* v. *Chasteen,* 228 S. C. 88, 88 S. E. 2d 880 (1955). South Dakota: *State* v. *Landers,* 21 S. D. 606, 114 N. W. 717 (1908); *State* v. *Nicholas,* 62 S. D. 511, 253 N. W. 737 (1934), *semble.* Tennessee: *Wynn* v. *State,* 181 Tenn. 325, 181 S. W. 2d 332 (1944); *Ford* v. *State,* 184 Tenn. 443, 201 S. W. 2d 539 (1945); *Taylor* v. *State,* 191 Tenn. 670, 235 S. W. 2d 818 (1950); and see *McGhee* v. *State,* 183 Tenn. 20, 189 S. W. 2d

many times deprecated the practice even while receiving in evidence the confessions it has produced.[39]   The manual known as the Judges' Rules, first issued in 1912, augmented in 1918, and clarified by a Home Office Circular

826 (1945) ; *Acklen* v. *State*, 196 Tenn. 314, 267 S. W. 2d 101 (1954). Texas: *Dimery* v. *State*, 156 Tex. Cr. R. 197, 240 S. W. 2d 293 (1951) ; *Leviness* v. *State*, 157 Tex. Cr. R. 160, 247 S. W. 2d 115 (1952) ; *Golemon* v. *State*, 157 Tex. Cr. R. 534, 247 S. W. 2d 119 (1952) ; *LeFors* v. *State*, 161 Tex. Cr. R. 544, 278 S. W. 2d 837 (1954) ; *Walker* v. *State*, 162 Tex. Cr. R. 408, 286 S. W. 2d 144 (1955) ; *Childress* v. *State*, 166 Tex. Cr. R. 95, 312 S. W. 2d 247 (1958). Utah: *Mares* v. *Hill*, 118 Utah 484, 222 P. 2d 811 (1950) ; and see *State* v. *Gardner*, 119 Utah 579, 230 P. 2d 559 (1951) ; *State* v. *Braasch*, 119 Utah 450, 229 P. 2d 289 (1951).   Vermont: *State* v. *Blair*, 118 Vt. 81, 99 A. 2d 677 (1953) ; *State* v. *Goyet*, 120 Vt. 12, 132 A. 2d 623 (1957).   Virginia: *James* v. *Commonwealth*, 192 Va. 713, 66 S. E. 2d 513 (1951) ; *Campbell* v. *Commonwealth*, 194 Va. 825, 75 S. E. 2d 468 (1953) ; *Mendoza* v. *Commonwealth*, 199 Va. 961, 103 S. E. 2d 1 (1958).   Washington: *State* v. *Winters*, 39 Wash. 2d 545, 236 P. 2d 1038 (1951) ; *State* v. *Johnson*, 53 Wash. 2d 666, 335 P. 2d 809 (1959).   West Virginia: *State* v. *Digman*, 121 W. Va. 499, 5 S. E. 2d 113 (1939) ; *State* v. *Bruner*, 143 W. Va. 755, 105 S. E. 2d 140 (1958) ; and see *State* v. *Brady*, 104 W. Va. 523, 140 S. E. 546 (1927).   Wisconsin: *State* v. *Fransisco*, 257 Wis. 247, 43 N. W. 2d 38 (1950) ; *Kiefer* v. *State*, 258 Wis. 47, 44 N. W. 2d 537 (1950) ; *State* v. *Babich*, 258 Wis. 290, 45 N. W. 2d 660 (1951) ; *State* v. *Stortecky*, 273 Wis. 362, 77 N. W. 2d 721 (1956) ; *State* v. *Bronston*, 7 Wis. 2d 627, 97 N. W. 2d 504, 98 N. W. 2d 468 (1959). Wyoming: *Mortimore* v. *State*, 24 Wyo. 452, 161 P. 766 (1916) ; *State* v. *Lantzer*, 55 Wyo. 230, 99 P. 2d 73 (1940).

[39] *Regina* v. *Berriman*, 6 Cox C. C. 388, 388–389 ("I very much disapprove of this proceeding.  By the law of this country, no person ought to he [*sic*] made to criminate himself, and no police officer has any right, until there is clear proof of a crime having been committed, to put searching questions to a person for the purpose of eliciting from him whether an offence has been perpetrated or not. If there is evidence of an offence, a police officer is justified, after a proper caution, in putting to a suspected person interrogatories with a view to ascertaining whether nor not there are fair and reasonable grounds for apprehending him.  Even this course should be very sparingly resorted to. . . .  I wish it to go forth amongst those

published in 1930, embodies the attitude of the English Bench in this regard.[40]   While encouraging police officers to put questions to all possibly informed persons, whether or not suspected, during the early phase of their investi-

who are inferior officers in the administration of justice, that such a practice is entirely opposed to the spirit of our law."); *Regina* v. *Mick*, 3 F. & F. 822, 823 ("I entirely disapprove of the system of police officers examining prisoners.   The law has surrounded prisoners with great precautions to prevent confessions being extorted from them, and the magistrates are not allowed to question prisoners, or to ask them what they have to say; and it is not for policemen to do these things.   It is assuming the functions of the magistrate without those precautions which the magistrates are required by the law to use, and assuming functions which are entrusted to the magistrates and to them only."); *Regina* v. *Reason,* 12 Cox C. C. 228, 229 ("It is the duty of the police-constable to hear what the prisoner has voluntarily to say, but after the prisoner is taken into custody it is not the duty of the police-constable to ask questions."); *Regina* v. *Cheverton,* 2 F. & F. 833, 835; *Regina* v. *Regan,* 17 Law Times Rep. (N. S.) 325, 326.

[40] The first four of the rules, drawn up by the judges of the King's Bench at the request of the Home Secretary, were circulated in 1912. Their text is set forth in *Rex* v. *Voisin,* [1918] 1 K. B. 531, 539, n. (3).   A memorandum approved by the judges in 1918 increased their number to nine.   See 145 Law Times 389 (Sept. 28, 1918). Ambiguities in the rules were pointed out by a Royal Commission in 1929, see Report of the Royal Commission on Police Powers and Procedure [Cmd. 3297] (1929) 69–74, and in response to the Commission's observations a clarifying circular was issued by the Home Office in 1930 with the approval of the judges.   See 6 Police Journal (1933) 342, 352–356; 1 Taylor on Evidence (12th ed. 1931) 557–559.   Further Home Office Circulars in 1947 and 1948 were approved by the Lord Chief Justice.   For the text of the Rules and Circulars as presently in operation, see 1 Stone's Justices' Manual (92d ed. 1960) 353–356.   See also Devlin, The Criminal Prosecution in England (1958), 38–42, 137–141.   The Home Secretary recently responded to Parliament that he had been in touch with the Lord Chief Justice, who had agreed that the time had come when it would be appropriate for the judges to carry out a review of the scope and operation of the Judges' Rules, 636 H. C. Deb., Hansard, No. 75 [written answers] 145 (March 16, 1961).

gation which aims at discovering who committed the offense, the Rules admonish that so soon as the officers make up their minds to charge a particular person with a crime, they should caution him, first, that he need say nothing and, second, that what he says may be used in evidence, before questioning him or questioning him further. Persons in custody are not to be questioned, except that when a prisoner, having been cautioned, volunteers a statement, such questions may be asked as are fairly needed to remove ambiguities, so long as the questioner does not seek to elicit information beyond the scope of what the prisoner has offered. If two or more persons are charged with an offense and the police have taken the statement of one of them, copies may be furnished to the others but nothing should be said or done to invite a reply.[41] The Judges' Rules are not "law" in the sense

---

[41] The Rules, in pertinent part, are:

"(1) When a police officer is endeavouring to discover the author of a crime, there is no objection to his putting questions in respect thereof to any person or persons, whether suspected or not, from whom he thinks that useful information can be obtained.

"(2) Whenever a police officer has made up his mind to charge a person with a crime, he should first caution such person before asking any questions or any further questions, as the case may be.

"(3) Persons in custody should not be questioned without the usual caution being first administered.

"(4) If the prisoner wishes to volunteer any statement, the usual caution should be administered . . . .

.     .     .     .     .

"(7) A prisoner making a voluntary statement must not be cross-examined, and no questions should be put to him about it except for the purpose of removing ambiguity in what he has actually said. For instance, if he has mentioned an hour without saying whether it was morning or evening, or has given a day of the week and day of the month which do not agree, or has not made it clear to what individual or what place he intended to refer in some part of his statement, he may be questioned sufficiently to clear up the point.

"(8) When two or more persons are charged with the same offence and statements are taken separately from the persons charged, the

that any violation of them by a questioning officer *eo ipso* renders inadmissible in evidence whatever incriminatory responses he may obtain.[42]   But it is clear that the judges presiding at criminal trials have broad discretion to exclude any confession procured by methods which offend against the letter or the spirit of the Rules,[43] and violations have in a few instances seemed to influence, although not to control, the judgment of the Court of Criminal Appeal in quashing convictions.[44]   For these reasons,

police should not read these statements to the other persons charged, but each of such persons should be furnished by the police with a copy of such statements and nothing should be said or done by the police to invite a reply.  If the person charged desires to make a statement in reply, the usual caution should be administered."

These must be read in connection with the Home Office Circular of 1930, which states:

"Rule 3 was never intended to encourage or authorize the questioning or cross-examination of a person in custody after he has been cautioned, on the subject of the crime for which he is in custody, and long before this Rule was formulated, and since, it has been the practice for the Judge not to allow any answer to a question so improperly put to be given in evidence; but in some cases it may be proper and necessary to put questions to a person in custody after the caution has been administered.  For instance, a person arrested for a burglary may, before he is formally charged, say, 'I have hidden or thrown the property away,' and after caution he would properly be asked, 'Where have you hidden or thrown it?'; or a person, before he is formally charged as a habitual criminal, is properly asked to give an account of what he has done since he last came out of prison.  Rule 3 is intended to apply to such cases and, so understood, is not in conflict with and does not qualify Rule 7, which prohibits any question upon a voluntary statement except such as is necessary to clear up ambiguity."

[42] *Regina* v. *Wattam*, 36 Crim. App. Rep. 72, 77; *Regina* v. *Straffen*, [1952] 2 Q. B. 911, 914 (Crim. App.).

[43] *Ibid.*; *Rex* v. *May*, 36 Crim. App. Rep. 91, 93; *Rex* v. *Voisin*, [1918] 1 K. B. 531, 539–540; see "Questioning an Accused Person," 92 J. P. 743, 758 (1928); Brownlie, Police Questioning, Custody and Caution, [1960] Crim. L. Rev. 298.

[44] See *Rex* v. *Dwyer*, 23 Crim. App. Rep. 156; *Regina* v. *Bass*, 37 Crim. App. Rep. 51.

and because of the respect which attaches to the Rules in view of their source, they have doubtless had a pervasive effect upon actual police practices, and they appear to be regarded by the constabulary as a more or less infrangible code.[45]  Inasmuch as the same conception is shared by counsel for the Crown, the contemporary English reports do not disclose cases involving the sort of claims of coercion so frequently litigated in our courts. It may well be that their circumstances seldom arise; [46] when they do, the Crown does not offer the confession; if it were offered—in a case, for example, where several hours of questioning could be shown—the trial judge would almost certainly exclude it.[47]

This principle by which the English trial judges have supplemented the traditional Anglo-American rule that

---

[45] See Devlin, The Criminal Prosecution in England (1958), *passim*.

[46] No doubt the Judges' Rules are sometimes broken, but the reported breaches themselves seem relatively mild—compared with what is common American police practice—so that even these appear to support the conclusion that, in the large, the tenor of the Rules is that which prevails in practical operation among the English constabulary.  See the several articles composing the "Special Issue on Police Questioning," [1960] Crim. L. Rev. 298–356; Elliott, Book Review, 5 J. Soc. Public Teachers of Law (N. S.) 230 (1960).

The furor, both within and without Parliament, raised by an afternoon's questioning of Miss Savidge, is illuminating.  See Inquiry In Regard to the Interrogation By the Police of Miss Savidge, Report of the Tribunal appointed under the Tribunals of Inquiry (Evidence) Act, 1921 [Cmd. 3147] (1928); 217 H. C. Deb. 1216–1220, 1303–1339, 1921–1931 (5th ser. 1928). So is the comment to which the English practice has sometimes given occasion. See, *e. g.*, Forsyth, The History of Lawyers (1875), 282, n. 1: "Not long ago, at a trial at the Central Criminal Court, a policeman was asked whether the prisoner had not made a statement.  He answered, 'No: he was beginning to do so; *but I knew my duty better*, and I prevented him.' "

[47] See the 1905 decision, *Rex* v. *Knight*, 21 T. L. Rep. 310; and see *Rex* v. *Kay*, 11 B. C. 157.

confessions are admissible if voluntary, by the exercise of a discretion to exclude incriminating statements procured by methods deemed oppressive although not deemed fundamentally inconsistent with accusatorial criminal procedure,[48] has not been imitated in the United States.[49] In 1943 this Court, in *McNabb* v. *United States,* 318 U. S. 332, drew upon its supervisory authority over the administration of federal criminal justice to inaugurate an exclusionary practice considerably less stringent than the English. That practice requires the exclusion of any confession "made during illegal detention due to failure promptly to carry a prisoner before a committing magistrate, whether or not the 'confession is the result of torture, physical or psychological . . . .' " *Upshaw* v. *United States,* 335 U. S. 410, 413.[50] Its purpose is to give effect to the requirement that persons arrested be brought without unnecessary delay before a judicial officer—a safeguard which our society, like other civilized

---

[48] Compare *Rex* v. *Godwin,* [1924] 2 D. L. R. 362 (K. B., N. B.), with *Ibrahim* v. *Rex,* [1914] A. C. 599 (P. C.). And see *Rex* v. *Pattison,* 21 Cr. App. Rep. 139.

[49] The Judges' Rules' requirement of a caution has been adopted, however, and made a condition of admissibility of incriminating statements, by the Uniform Code of Military Justice, 10 U. S. C. § 831. The same requirement, with certain exceptions, prevails by statute in Texas. Tex. Code Crim. Proc., Arts. 726, 727. Compare S. 3325, 85th Cong., 2d Sess.

[50] In *McNabb,* our decision turned on the failure of the arresting officers to comply with procedures prescribed by federal statutes then in effect requiring prompt production of persons arrested for preliminary examination. Compare *Anderson* v. *United States,* 318 U. S. 350. The *Upshaw* case and *Mallory* v. *United States,* 354 U. S. 449, carried the same exclusionary rule over in implementation of Fed. Rules Crim. Proc., 5 (a). Of course, our decision in *United States* v. *Mitchell,* 322 U. S. 65, makes clear that confessions made during the period immediately following arrest and before delay becomes unlawful are not to be excluded under the rule.

societies, has found essential to the protection of personal liberty.[51]

The *McNabb* case was an innovation which derived from our concern and responsibility for fair modes of criminal proceeding in the federal courts.[52]  The States, in the large, have not adopted a similar exclusionary principle.[53]  And although we adhere unreservedly to *McNabb*

---

[51] 318 U. S., at 343–344:

". . . The awful instruments of the criminal law cannot be entrusted to a single functionary.  The complicated process of criminal justice is therefore divided into different parts, responsibility for which is separately vested in the various participants upon whom the criminal law relies for its vindication.  Legislation . . . requiring that the police must with reasonable promptness show legal cause for detaining arrested persons, constitutes an important safeguard—not only in assuring protection for the innocent but also in securing conviction of the guilty by methods that commend themselves to a progressive and self-confident society.  For this procedural requirement checks resort to those reprehensible practices known as the 'third degree' which, though universally rejected as indefensible, still find their way into use.  It aims to avoid all the evil implications of secret interrogation of persons accused of crime.  It reflects not a sentimental but a sturdy view of law enforcement.  It outlaws easy but self-defeating ways in which brutality is substituted for brains as an instrument of crime detection."  See notes 26, 27, *supra*.

[52] Prior to *McNabb*, the rule prevailing in the federal courts made voluntariness the test of admissibility.  *Ziang Sung Wan* v. *United States*, 266 U. S. 1.  See also *Bram* v. *United States*, 168 U. S. 532.

[53] See cases cited in note 38, *supra*.  Alabama, Arizona, Arkansas, California, Connecticut, Florida, Georgia, Hawaii, Illinois, Indiana, Iowa, Kansas, Louisiana (*semble*), Maryland, Massachusetts (*semble*), Mississippi, Missouri, Nevada, New Jersey, New York, North Carolina (*semble*), North Dakota, Ohio, Oklahoma, Oregon, Pennsylvania (no prompt-arraignment statute), Rhode Island (*semble*), Tennessee (no prompt-arraignment statute), Texas, Utah, Vermont (*semble*), Virginia, Washington and Wisconsin (*semble*) have expressly rejected *McNabb*.  Colorado appears clearly to reject it.  Minnesota also appears to reject it, the decision in *State* v. *Schabert*, 222 Minn. 261, 24 N. W. 2d 846, qualifying whatever suggestion might have been inferred from the opinion in the earlier appeal of the same

for federal criminal cases, we have not extended its rule to state prosecutions as a requirement of the Fourteenth Amendment. *Gallegos* v. *Nebraska,* 342 U. S. 55, 63–64 (opinion of Reed, J.); *Brown* v. *Allen,* 344 U. S. 443, 476; *Stein* v. *New York,* 346 U. S. 156, 187–188; cf. *Lyons* v. *Oklahoma,* 322 U. S. 596, 597–598, n. 2; *Townsend* v. *Burke,* 334 U. S. 736, 738; *Stroble* v. *California,* 343 U. S. 181, 197.

In light of our past opinions and in light of the wide divergence of views which men may reasonably maintain concerning the propriety of various police investigative procedures not involving the employment of obvious brutality, this much seems certain: It is impossible for this Court, in enforcing the Fourteenth Amendment, to attempt precisely to delimit, or to surround with specific, all-inclusive restrictions, the power of interrogation allowed to state law enforcement officers in obtaining confessions. No single litmus-paper test for constitutionally impermissible interrogation has been evolved: neither extensive cross-questioning—deprecated by the English judges; nor undue delay in arraignment—proscribed by *McNabb;* nor failure to caution a prisoner—enjoined by the Judges' Rules; nor refusal to permit communication with friends and legal counsel at stages in the proceeding when the prisoner is still only a suspect—prohibited by several state statutes. See *Lisenba* v. *Cali-*

case, 218 Minn. 1, 15 N. W. 2d 585, that *McNabb* would be followed. There is dictum in Kentucky suggesting that protracted pre-arraignment delay would not *eo ipso* cause exclusion of a confession. *Reed* v. *Commonwealth,* 312 Ky. 214, 218, 226 S. W. 2d 513, 514–515 (1949). Idaho, where *State* v. *Johnson,* 74 Idaho 269, 261 P. 2d 638, limits and in part overrules *State* v. *Kotthoff,* 67 Idaho 319, 177 P. 2d 474 (a decision whose reasoning seems in some respects similar to that of *McNabb*) must now be regarded as uncommitted. The only State to follow *McNabb* is Michigan. *People* v. *Hamilton,* 359 Mich. 410, 102 N. W. 2d 738.

*fornia,* 314 U. S. 219; *Crooker* v. *California,* 357 U. S. 433; *Ashdown* v. *Utah,* 357 U. S. 426.

Each of these factors, in company with all of the surrounding circumstances—the duration and conditions of detention (if the confessor has been detained), the manifest attitude of the police toward him, his physical and mental state, the diverse pressures which sap or sustain his powers of resistance and self-control—is relevant.[54] The ultimate test remains that which has been the only clearly established test in Anglo-American courts for two hundred years: the test of voluntariness. Is the confession the product of an essentially free and unconstrained choice by its maker? If it is, if he has willed to confess, it may be used against him. If it is not, if his will has been overborne and his capacity for self-determination critically impaired, the use of his confession offends due process. *Rogers* v. *Richmond,* 365 U. S. 534. The line of distinction is that at which governing self-direction is lost and compulsion, of whatever nature or however infused, propels or helps to propel the confession.

---

[54] Cf. *Cicenia* v. *Lagay,* 357 U. S. 504, 509:

". . . On the one hand, it is indisputable that the right to counsel in criminal cases has a high place in our scheme of procedural safeguards. On the other hand, it can hardly be denied that adoption of petitioner's position [that any state denial of a defendant's request to confer with counsel during police questioning violates due process] would constrict state police activities in a manner that in many instances might impair their ability to solve difficult cases. A satisfactory formula for reconciling these competing concerns is not to be found in any broad pronouncement that one must yield to the other in all instances. Instead, . . . this Court, in judging whether state prosecutions meet the requirements of due process, has sought to achieve a proper accommodation by considering a defendant's lack of counsel one pertinent element in determining from all the circumstances whether a conviction was attended by fundamental unfairness."

## IV.

The inquiry whether, in a particular case, a confession was voluntarily or involuntarily made involves, at the least, a three-phased process. First, there is the business of finding the crude historical facts, the external, "phenomenological" occurrences and events surrounding the confession. Second, because the concept of "voluntariness" is one which concerns a mental state, there is the imaginative recreation, largely inferential, of internal, "psychological" fact. Third, there is the application to this psychological fact of standards for judgment informed by the larger legal conceptions ordinarily characterized as rules of law but which, also, comprehend both induction from, and anticipation of, factual circumstances.

In a case coming here from the highest court of a State in which review may be had, the first of these phases is definitely determined, normally, by that court. Determination of what happened requires assessments of the relative credibility of witnesses whose stories, in cases involving claims of coercion, are frequently, if indeed not almost invariably, contradictory. That ascertainment belongs to the trier of facts before whom those witnesses actually appear, subject to whatever corrective powers a State's appellate processes afford.

This means that all testimonial conflict is settled by the judgment of the state courts. Where they have made explicit findings of fact, those findings conclude us and form the basis of our review—with the one *caveat,* necessarily, that we are not to be bound by findings wholly lacking support in evidence. See *Thompson* v. *Louisville,* 362 U. S. 199. Where there are no explicit findings, or in the case of *lacunae* among the findings, the rejection of a federal constitutional claim by state criminal courts applying

proper constitutional standards [55] resolves all conflicts in testimony bearing on that claim against the criminal defendant. In such instances, we consider only the uncontested portions of the record: the evidence of the prosecution's witnesses and so much of the evidence for the defense as, fairly read in the context of the record as a whole, remains uncontradicted. *Ashcraft* v. *Tennessee,* 322 U. S. 143, 152–153; *Lyons* v. *Oklahoma,* 322 U. S. 596, 602–603; *Watts* v. *Indiana,* 338 U. S. 49, 50–52 (opinion of FRANKFURTER, J.) ; *Gallegos* v. *Nebraska,* 342 U. S. 55, 60–62; *Stein* v. *New York,* 346 U. S. 156, 180–182; *Payne* v. *Arkansas,* 356 U. S. 560, 561–562; *Thomas* v. *Arizona,* 356 U. S. 390, 402–403.

The second and third phases of the inquiry—determination of how the accused reacted to the external facts, and of the legal significance of how he reacted—although distinct as a matter of abstract analysis, become in practical operation inextricably interwoven. This is so, in part, because the concepts by which language expresses an otherwise unrepresentable mental reality are themselves generalizations importing preconceptions about the reality to be expressed. It is so, also, because the apprehension of mental states is almost invariably a matter of induction, more or less imprecise, and the margin of error which is thus introduced into the finding of "fact" must be accounted for in the formulation and application of the "rule" designed to cope with such classes of facts. The

[55] The record in this case does not make clear, as did that in *Rogers* v. *Richmond,* 365 U. S. 534, that the legal standard applied by the trial judge in passing upon the admissibility of Culombe's confessions was, under this Court's decisions, an impermissible one. In view of the disposition which we make upon the facts of this case, viewed under the assumption that a proper criterion of judgment was employed below, we need not further pursue the inquiry whether the trial judge's standard satisfied the constitutional requirements regarding coercion.

notion of "voluntariness" is itself an amphibian.  It purports at once to describe an internal psychic state and to characterize that state for legal purposes.  Since the characterization is the very issue "to review which this Court sits," *Watts* v. *Indiana,* 338 U. S. 49, 51 (opinion of FRANKFURTER, J.), the matter of description, too, is necessarily open here.  See *Lisenba* v. *California,* 314 U. S. 219, 237–238; *Ward* v. *Texas,* 316 U. S. 547, 550; *Haley* v. *Ohio,* 332 U. S. 596, 599; *Malinski* v. *New York,* 324 U. S. 401, 404, 417.

No more restricted scope of review would suffice adequately to protect federal constitutional rights.  For the mental state of involuntariness upon which the due process question turns can never be affirmatively established other than circumstantially—that is, by inference; and it cannot be competent to the trier of fact to preclude our review simply by declining to draw inferences which the historical facts compel.  Great weight, of course, is to be accorded to the inferences which are drawn by the state courts.  In a dubious case, it is appropriate, with due regard to federal-state relations, that the state court's determination should control.  But where, on the uncontested external happenings, coercive forces set in motion by state law enforcement officials are unmistakably in action; where these forces, under all the prevailing states of stress, are powerful enough to draw forth a confession; where, in fact, the confession does come forth and is claimed by the defendant to have been extorted from him; and where he has acted as a man would act who is subjected to such an extracting process—where this is all that appears in the record—a State's judgment that the confession was voluntary cannot stand.

". . . [I]f force has been applied, this Court does not leave to local determination whether or not the confession was voluntary.  There is torture of mind as well as body; the will is as much affected by fear

as by force. And there comes a point where this Court should not be ignorant as judges of what we know as men." *Watts* v. *Indiana, supra,* at 52.

## V.

We turn, then, to the uncontested historical facts as they appear in this record. Since judgment as to legal voluntariness *vel non* under the Due Process Clause is drawn from the totality of the relevant circumstances of a particular situation, a detailed account of them is unavoidable. When Culombe's confessions were offered by the prosecution and objected to as constitutionally inadmissible, the Connecticut Superior Court, pursuant to the applicable Connecticut procedure,[56] excused the jury and took evidence bearing on the issue of coercion. It later made explicit findings setting forth the facts which it credited and deemed relevant. On the basis of these findings and—insofar as they do not cover all aspects of the testimony—of evidence that is uncontradicted, the following may be taken as established.[57]

---

[56] *State* v. *Buteau,* 136 Conn. 113, 116–118, 68 A. 2d 681, 682–683; *State* v. *Lorain,* 141 Conn. 694, 699–700, 109 A. 2d 504, 506–507. And see *State* v. *McCarthy,* 133 Conn. 171, 177, 49 A. 2d 594, 596–597.

[57] Portions of the following statement of facts are based upon testimony introduced into the record in the case of Taborsky, Culombe's co-defendant, who was tried jointly with Culombe. Virtually all of the evidence concerning Culombe's mental capacity was introduced, not at the time of the trial to the court of the issue of coercion relevant to the admissibility of Culombe's confessions, but at a later stage of the trial, in connection with Culombe's defense of insanity. Since all of this evidence was in the record at the time that the Supreme Court of Errors considered and rejected Culombe's federal claim of coercion, and since the opinion of that court does not indicate that it considered the material improperly before it as a matter of state procedure, we need not now decide what effect such a ruling would have on the scope of our review. Compare *Blackburn* v. *Alabama,* 361 U. S. 199, 209–211.

In February 1957, the Connecticut State Police at Hartford were investigating a number of criminal incidents. In connection with certain of these (other than the Kurp's Gasoline Station killings in New Britain) it was decided on Saturday, February 23 to have two men, Arthur Culombe and Joseph Taborsky, picked up and viewed by witnesses. Lieutenant Rome, who was in charge of the investigation, delegated teams of officers to go to different addresses where the men might be located.

Shortly after 2 p. m., two officers accosted Culombe and Taborsky entering a car in front of the home of the latter's mother in Hartford. They told Taborsky that Lieutenant Rome wanted to talk to him at State Police Headquarters. They said that this was not an arrest. Taborsky stated that he was willing to go and Culombe drove him to Headquarters, following the officer's car. Leaving Taborsky, Culombe immediately drove home.

Shortly after his arrival, at about 2:30 p. m., Sergeant Paige and another officer came to Culombe's apartment to bring him back to Headquarters. They told Culombe that he was not arrested, that Lieutenant Rome wanted to talk to him. Culombe drove Sergeant Paige to Headquarters in his, Culombe's, car. From this time, Culombe was never again out of the effective control of the police.

Lieutenant Rome spoke briefly to Culombe and Taborsky and asked them if they would agree to accompany several officers to Coventry and Rocky Hill for purposes of possible identification. They consented. Sergeant Paige and two other officers took Culombe and Taborsky on this trip, which consumed about three hours, between 3 and 6 p. m. In the car, Culombe was questioned concerning his possible participation in several crimes. He was not then regarded as under arrest. During the stops at Coventry and Rocky Hill, after Culombe and Taborsky, at the officers' request, had entered a country store and a package store feigning to be customers, the

two men were left for brief periods of time in the police cruiser with only Officer Griffin present. Griffin permitted them to drink the contents of a bottle of liquor which Taborsky carried.

On the return to Hartford the group stopped at a diner for dinner. Culombe and Taborsky were told to order what they wanted and ate well. At Headquarters Culombe was questioned for an hour by Paige concerning his possession of guns. He told Paige that he was a gun collector and had seven or eight guns at his home which he agreed to turn over to the police. The reason Culombe revealed this information to Paige was that the guns were registered and Culombe knew that Paige could have traced them to him in any event.

Paige and another officer took Culombe to his home, where Culombe left them in the living room and went to the bedroom. Following, they found him with two guns. They found a clip of cartridges in a drawer which he had just closed and six more guns in a small safe. They took these. Culombe and the second officer left and waited together on the street near the cruiser, the officer holding Culombe's arm, for approximately twenty minutes while Paige remained in Culombe's apartment questioning Culombe's wife.

Culombe was taken back to Headquarters. Paige talked with him for a short while, then discontinued his investigation for the night. Rome talked with Culombe for about two hours, apparently over a three- or three-and-a-half-hour period. The talk concerned the Kurp's killings and other matters. At this time Culombe and Taborsky were kept in separate rooms. Rome would question one, then the other, staying with each man until he got some bit of information that he could have checked. During respites of questioning by Rome, Culombe remained in the interrogation room.

At one point, Culombe told Rome that he wanted to see a lawyer but did not give the name of any specific lawyer. Rome replied that Culombe could have any lawyer he wanted if Culombe would tell Rome what lawyer to call. Rome knew that Culombe, an illiterate, was unable to use the telephone directory.

About 10 p. m., Rome put Culombe under arrest by virtue of a Connecticut statute permitting arrest without a warrant where the arresting officer has cause to suspect that the person arrested has committed a felony. The statute requires that persons so arrested be presented with reasonable promptness before the proper authority.[58] Culombe was taken to a cell at Headquarters sometime before midnight. However, the log book in which notation is customarily made of prisoners detained in the Headquarters cell blocks shows no entry for Culombe Saturday night.

Concerning the purpose of the questioning which began on Saturday and continued intermittently until Culombe confessed the following Wednesday, Sergeant Paige candidly admitted that it was intended to obtain a confession if a confession was obtainable.[59] Lieutenant Rome agreed that he had kept after Culombe until he got answers which he could prove were correct.[60] There is

---

[58] Conn. Gen. Stat., 1955 Supp., § 195d, now Conn. Gen. Stat., 1958, § 6–49: ". . . [M]embers of the state police department . . . shall arrest, without previous complaint and warrant, any person who such officer has reasonable grounds to believe has committed or is committing a felony. Any person so arrested shall be presented with reasonable promptness before proper authority."

[59] "Q. All of the questioning of Culombe, from the time that he was taken into custody was with the object in view of obtaining a confession if a confession was obtainable, that is true, isn't it? A. That is correct." (Cross-examination of Sergeant Paige.)

[60] "Q. You kept after him, to use very conservative words? A. Yes, sir. Q. Until you received the answers that you wanted?

no indication that at any time Culombe was warned of his right to keep silent. Neither Paige nor anyone in Paige's hearing cautioned Culombe concerning his constitutional rights.[61]

On Sunday, February 24, Culombe was questioned for a short time about the New Britain killings and denied that he was involved. He was also questioned by Paige and a Hartford detective about another robbery. The following morning Culombe and Taborsky were driven to New Britain and, after a substantial wait at the Detective Headquarters building, were booked for breach of the peace at New Britain Police Headquarters. Crowds lined both sides of the street where the stations were located. After the booking, en route back to Hartford, the cruiser in which Culombe rode stopped at Kurp's gas station. Rome asked Culombe if he recognized the place; Culombe said that he did not. On Monday afternoon Culombe was again questioned at Headquarters concerning Kurp's as well as other matters. Lieutenant Rome questioned him for two or three hours. Sergeant Paige also questioned him for twenty minutes or half an hour, but this appears to have been concurrent with Rome's questioning. Culombe then confessed to the

---

That's right, isn't it? A. No, sir. Until we received the answers which we proved were correct. Q. The answers that you wanted were admissions of guilt? You wanted those answers? A. No, sir, not if he were not guilty. Q. You were bound and determined, weren't you, Lieutenant, to get such answers? A. No, sir. Not if he were guilty. [*Sic*] We wanted answers that we could prove were correct." (Cross-examination of Lieutenant Rome.)

[61] "Q. Were they told of their rights, Constitutional rights? A. I didn't tell them. Q. You didn't hear anyone else tell it to them? A. No, sir, not that I know of." (Cross-examination of Sergeant Paige.) It is unclear from the context of these responses whether they are meant to refer to the whole of Culombe's period of detention or only to Saturday afternoon.

theft of certain canned goods and made a statement about them that was reduced to writing.

On Tuesday, February 26, Culombe was removed from his cell to be taken to the New Britain Police Court for presentation on the breach of the peace charge. At that time Rome told him that he was to be brought to court and would have an opportunity to see a lawyer. At New Britain there were again crowds on the street, but not as heavy as Monday's.

The courtroom was crowded. Once in it, Culombe and Taborsky were placed in a prisoners' pen, a wire-mesh, cage-like affair in the corner of the room. Photographers with flashbulbs took photographs of them in the pen. The crowd was between the pen and the judge's bench. When court convened, the two men were presented for breach of the peace. Culombe was not required to plead. He was not heard by the court. He was not taken out of the pen and brought before the bench. He was not told that he might have counsel. No one informed the judge that Culombe had previously asked to see a lawyer. At Lieutenant Rome's suggestion, the prosecuting attorney moved for a continuance. Without giving Culombe an occasion to contest the motion or participate in any way in the proceedings, the court continued the case for a week and issued a mittimus committing Culombe to the Hartford County Jail until released by due course of law.

The idea of presenting Culombe and Taborsky on charges of breach of the peace was Rome's, in collaboration with the alternate prosecutor.[62] Its purpose, Rome

---

[62] Rome admitted that he might have told someone that he was taking a chance presenting Culombe on a breach of the peace charge (there was a chance, he said, as to whether or not the police could get a conviction for breach of the peace), and that he had thanked the alternate prosecutor for coming down to Hartford from New Britain on Sunday night at his request in connection with this matter.

testified, was "To help me investigate some serious crimes in the state of Connecticut." This breach of the peace prosecution was later nolled, Culombe having never been brought back before the Police Court because "It wasn't necessary." [63] In testimony admitted in Taborsky's case, Rome conceded that he could have booked Taborsky (and hence, presumably, Culombe, since the legal proceedings against the two men were at all stages prosecuted simultaneously) on Sunday and presented him on Monday, but delayed because he, Rome, wanted more time, more interrogation. Presenting the man on Monday, although it would have been in accordance with the Connecticut statute requiring presentation with reasonable promptness, was not, Rome testified, "in accordance with good investigation." [64]

On leaving the Police Court, and after another stop at Kurp's, Culombe was returned to Headquarters in Hartford, where he and Taborsky were questioned by Rome and other officers during an indeterminate period that cannot have been more than about two hours. At 3 or 4 that afternoon, Rome visited the Culombe home and questioned Culombe's wife for half an hour. Rome

---

[63] The testimony is Lieutenant Rome's.

[64] "Q. You could have presented him on Monday, couldn't you? A. Yes, sir. Q. And you didn't do that? A. No, sir. Q. Why didn't you do it? . . . The Witness: It wasn't in accordance with good investigation. Q. But it was in accordance with the Statute, wasn't it? A. Yes, sir. Q. With reasonable promptness to bring him before a proper authority? A. Reasonable promptness—Tuesday morning, yes. . . . Q. You didn't bring him before the Court on Monday? A. No, sir. Q. And with reasonable promptness, you could have, couldn't you? A. Yes, sir. Q. But you wanted to hold him and do some more grilling, didn't you? Mr. Bill: Objection to the grilling. The Court: I will sustain it. Q. You wanted to interrogate him some more, didn't you? A. Yes, Mr. Burke. Q. And that is why you didn't bring him before the proper authority—you wanted some more time? A. Yes, Mr. Burke." (Cross-examination of Lieutenant Rome.)

then returned to Headquarters where, shortly thereafter, Mrs. Culombe arrived, brought in a police cruiser by a policewoman pursuant to arrangements made by Rome, but by her own request or, at the least, her own agreement. Her children were with her. She spoke briefly with Rome, who asked her if she "would go along and lay the cards on the table to her husband and see if he wouldn't confess." [65] Mrs. Culombe was then taken to a room where, in the presence of Rome and the policewoman, she talked to Culombe during a quarter of an hour. The children were not in the room. Mrs. Culombe asked Culombe if he were responsible for the New Britain killings and told him that if he were he should tell the police the truth. Rome permitted this confrontation because "it is another way of getting a confession." He admitted that he asked Mrs. Culombe to help the police and that she did help them indirectly; that he tried to use her as a means of securing her husband's confession.

After Mrs. Culombe left the room, Rome continued to question Culombe concerning certain conversations between Culombe and Taborsky. Culombe and Rome went to the door of the room and Rome called Culombe's thirteen-year-old daughter into the room, saying: "Honey, come in here and . . . . You tell me how they went into the bedroom and talked—Joe Taborsky and your father." There is no indication that the girl did come into the room or that she said anything.

Culombe was returned to his cell. Paige came to the cell and began to ask him questions, but Culombe was upset by the scene with his family and choked up or sobbed and told Paige that he did not want to talk. Paige discontinued the questioning and sat with Culombe for fifteen or twenty minutes until other officers came to remove Culombe to the County Jail pursuant to the mit-

---

[65] The testimony is Lieutenant Rome's.

timus of the New Britain Police Court. Paige admitted that Culombe's confrontation by his wife had been an "ordeal," and Rome agreed that the prisoner was "upset." Culombe was logged in at the jail between 8 and 9 that night.

At about 10 a. m. on Wednesday, February 27, jail guards came to Culombe's cell, led him to the gates of the jail, and turned him into the custody of Sergeant Paige and several other State Police officers. Notation was made on the books of the jail that the State Police had "borrowed" Culombe.[66] Held at Headquarters until 1 p. m., Culombe was then brought to the interrogation room for questioning by Paige and Detective Murphy. Paige, who was at first alone in the room with Culombe, began by telling Culombe that Culombe had been lying to him. He suggested that, whenever Culombe did not want to answer a question, Culombe say "I don't want to answer" instead of lying. Culombe agreed, and thereupon Paige, who held a list of the crimes being investigated, went through it questioning Culombe about his participation in each. Answering each question, Culombe stated either that he had not been there or that he did not want to talk about it. When Paige had gotten through the list, Murphy, having come in, took the list over and repeated the same questions that Culombe had answered or refused to answer for Paige. Paige left the room for a while, then re-entered. Murphy asked Culombe whether Culombe did not want to cooperate. Culombe said that he did but that it was a hard decision to make. Murphy asked whether Culombe was in fear of anyone and Culombe answered that he was in fear of Taborsky. After approximately an hour and a half, Culombe told the police that they were looking for four

---

[66] The Superior Court ruled that this borrowing was illegal under Connecticut law; the Supreme Court of Errors found it unnecessary to pass on the point.

guns and two men and that he had not done any killing himself. Immediately, Rome, who had been listening to the interrogation over an intercommunication system, came into the room and, shortly thereafter, Detective O'Brien also arrived. Culombe agreed to show the officers where the guns would be found.[67] He requested that they travel in an unmarked car and was assured that the cruiser would carry no identifying insignia. At about 3:30 p. m., the four officers and Culombe left Headquarters for Culombe's home.

During the short ride, Rome questioned Culombe in the rear seat of the car. The other three officers sat up front. When Culombe began to give answers which Rome regarded as significant, Rome told O'Brien, who had been driving, to let Murphy take the wheel. O'Brien, who was skilled at shorthand, understood that this meant that he was to take the conversation down. He did so. In it Culombe admitted participation in a number of crimes, including the gas station holdup. He gave a detailed description of what happened at Kurp's in which he related that he and Taborsky had robbed the station and that Taborsky had shot both the proprietor and the customer. Several officers testified to the content of this oral confession at the trial.

Culombe, the four officers and two police photographers entered the Culombes' project apartment. There they found Mrs. Culombe with her younger, five-year-old daughter. After directing Rome to a cache behind the medicine cabinet where certain weapons were concealed and to a safe compartment containing parts of a gun,

---

[67] Culombe requested that Mr. Bill, the State's Attorney, be told what he was doing, that he was cooperating. He said that he wanted Mr. Bill to see the statements that he made. The officers seem to have told Culombe that Mr. Bill would be notified of his cooperation but, in fact, Mr. Bill was never so notified.

Culombe spoke with his wife in the living room in the
presence of at least one detective. He told her that he
had decided to cleanse his conscience and make a clean
breast of things; that he was afraid that Taborsky might
harm her, and so he was cooperating. He also said that
he wanted to save Mrs. Culombe embarrassment as far
as the neighbors were concerned.[68] Leaving the apart-
ment in the cruiser, Culombe directed the officers to a
nearby swampy area where he pointed out the location
in which he had disposed of one gun and part of another
used at Kurp's. He led them to another swamp where
a raincoat said to have been worn on the night of the
holdup was recovered. After several other like stops he
was taken back to Headquarters, arriving just after 6
p. m. There, in response to brief questioning in the
presence of Major Remer and Commissioner Kelly, he
repeated his confessions of the early afternoon.

Culombe was taken to dinner. Shortly afterwards he
again saw Mrs. Culombe, who had come to Headquarters
with her five-year-old. The child was sick. Mrs.
Culombe told Culombe that the child was sick and
Culombe said that he thought that the policewoman
would take it to the hospital if she were asked. At about
8 p. m., Rome, Paige, O'Brien and County Detective
Matus brought Culombe to the interrogation room to
reduce his several confessions to writing. Culombe made
a number of statements. The manner of taking them
(no doubt complicated by Culombe's illiteracy and his
tendency to give rambling and non-consecutive answers)
was as follows: Rome questioned Culombe; Culombe

---

[68] Culombe testified that his five-year-old daughter, who was pres-
ent in the room, appeared sick to him at that time. The officers
testified that they did not notice any illness in the child and that
Culombe had expressed no apprehension concerning her health, but
it is undisputed that the little girl had to be taken to a hospital that
night with mumps.

answered; Rome transposed the answer into narrative form; Culombe agreed to it; Rome dictated the phrase or sentence to O'Brien. Each completed statement was read to and signed by Culombe. The last of them related to the Kurp's holdup and to another crime committed earlier on the same day. It was started shortly before 11 p. m. and the Kurp's episode was reached at 12:30 a. m. The Kurp's statement required a half hour to compose.

At the end of this four-and-a-half-hour interview, Culombe was unshaved, his clothing a sorry sight. He was tired. He spent that night in a cell at State Police Headquarters at his own request, apparently because he was afraid of Taborsky, who was still lodged in the Hartford Jail. Although the confession which he signed that night was not put in as an exhibit at the trial, it was fully laid before the jury by the receipt in evidence of another typed paper substituted for it by stipulation and whose contents, several officers testified, embodied the substance of what Culombe told them shortly after midnight Wednesday.[69]

---

[69] Because the Wednesday-midnight confession also contained references to another criminal offense, it was not physically offered in evidence at the trial. Counsel for the State and for the defense stipulated that another document, a substantially verbatim copy of the Kurp's portion of the confession, might be substituted for it. This was the so-called Monday confession. It was a paper prepared by the police from the Wednesday-midnight statement which was read to, and signed by, Culombe the following Monday. Notwithstanding the stipulation, the prosecution laid a foundation for the introduction as an exhibit of the Monday confession by offering testimony before the jury, first, that Culombe had made a statement Wednesday night; second, that it had been committed to writing; and third, that this writing was substantially identical to the typed paper which Culombe signed on Monday (witnesses on the stand examined and compared the documents). The Monday confession was then submitted to the jury. Under these circumstances, the effective use of the Wednesday-midnight statement was much the

On Thursday, February 28, Rome had Culombe brought into a room where he was talking to Taborsky. At the Lieutenant's direction, Culombe repeated his confession. Later Culombe was presented in the Superior Court on a charge of first-degree murder pursuant to a bench warrant issued that morning. The presiding judge warned Culombe of his rights to keep silent and to have counsel. He asked Culombe if he wanted counsel and Culombe replied that he did. Culombe said that he did not want the public defender, that he wanted attorney McDonough but could not afford to pay for his services. The judge promised that the court would see that Culombe had the attorney of his choice at state expense. He then informed Culombe that the police wished to conduct an investigation into the charges against him and had requested an order releasing Culombe into their custody for that purpose. Asked if he was willing to cooperate, Culombe said that he was. He was told that this might mean that he would be taken to the sites of various crimes and again said that he was willing to cooperate; he wanted "to cooperate with them in any way I can." Accordingly, the court released Culombe to the State Police Commissioner for the purpose of continuing the investigation.

At Kurp's gasoline station, Culombe re-enacted the holdup for Rome and other officers. Later that afternoon, at Headquarters, New York detectives talked to him concerning a New York killing. No further investigation relating to the Connecticut crimes was conducted that day or Friday. Culombe remained in the cell block at Headquarters, rather than at the County Jail, at his

same as if it had gone physically to the jury, and for purposes of the constitutional issue presented here we may treat the Wednesday-midnight confession as put in evidence. See *Malinski* v. *New York,* 324 U. S. 401.

own request. On Friday night he first saw Mr. McDonough, his court-appointed counsel, and also saw his wife.

Two state psychiatrists examined Culombe during two hours on Saturday, March 2. At 10 p. m. that evening, when Culombe was alone in his cell, he called out to the guard assigned to the cell block and said that he wanted to volunteer some information relating to the Kurp's holdup. The guard had not previously spoken to Culombe during his watch except to say, "Hi, Art," when he first came on duty at 6 o'clock. Culombe now narrated a new version of what had happened at Kurp's. This was generally similar to his previous statements except that in it he admitted that he himself had shot Kurpiewski. The guard telephoned this information to Lieutenant Rome and Culombe thanked him. At trial the guard related the occasion and contents of this oral confession to the jury.

Sunday morning, Rome, the guard to whom Culombe had confessed the night before, and another officer interviewed Culombe in the interrogation room. In answer to Rome's question, Culombe said that he wanted to change the story that he had previously given. He then said that he had shot Kurpiewski. Following the same procedure that had been used on Wednesday night, a detailed statement of his new version of the New Britain killings was composed and Culombe signed it. It was received in evidence at the trial. Later in the afternoon attorney McDonough spoke with Culombe and Rome at Headquarters. He told Culombe not to sign any more papers or to talk to the police. He told Rome that he did not want the police bothering Culombe further and requested that Culombe be removed from Headquarters to the County Jail. This was done.

The following day, Monday, March 4, Lieutenant Rome and Detective O'Brien visited Culombe at the jail for

half an hour. Rome brought a new typed statement prepared by the police. This was a substantially verbatim transcription of the document which Culombe had signed on Wednesday, but with all references to the second, separate crime committed on December 15, 1956, deleted. Rome read the transcription to Culombe and Culombe signed it. It was admitted at trial. Rome did not notify McDonough that Culombe's signature was to be obtained because he was worried that if he did, McDonough would not permit Culombe to sign. Rome testified that he could "do better without" the attorney: Culombe "was cooperative. . . . I needed his cooperation and got it."

The man who was thus cooperative with the police, Arthur Culombe, was a thirty-three-year-old mental defective of the moron class with an intelligence quotient of sixty-four [70] and a mental age of nine to nine and a half years. He was wholly illiterate.[71] Expert witnesses for the State, whose appraisal of Culombe's mental condition was the most favorable adduced at trial, classified him as a "high moron" and "a rather high grade mentally defective" and testified that his reactions would not be the same as those of the chronological nine-year-old because his greater physical maturity and fuller background of experience gave him a perspective that the nine-year-old would not possess. Culombe was, however, "handicapped."

Culombe had been in mental institutions for diagnosis and treatment. He had been in trouble with the law since he was an adolescent and had been in prison at least twice in Connecticut since his successful escape from a Massachusetts training school for mental defectives.

---

[70] As measured on the full scale Wechsler-Bellevue test. The normal intelligence quotient on this scale is ninety to one hundred and ten.

[71] Culombe can read and write only his name.

During the three years immediately preceding his arrest he had held down, and adequately performed, a freight handler's job and had supported his wife and two young children. A psychiatrist testifying for the State said that, although he was not a fearful man, Culombe was suggestible and could be intimidated.[72]

Ten days after his last confession, on March 14, 1957, Culombe was indicted for first-degree murder.

## VI.

In the view we take of this case, only the Wednesday confessions need be discussed.[73] If these were coerced, Culombe's conviction, however convincingly supported by other evidence, cannot stand. *Malinski* v. *New York,* 324 U. S. 401; *Stroble* v. *California,* 343 U. S. 181; *Payne* v. *Arkansas,* 356 U. S. 560. On all the circumstances of this record we are compelled to conclude that these confessions were not voluntary. By their use petitioner was deprived of due process of law.

---

[72] Again, this is the most favorable diagnosis of Culombe's capacity in this regard. The report of a clinical psychologist appointed by the court to examine Culombe both for the State and for the defense states: "In addition to being saddled with deficient mental equipment with which he must try to cope with life's problems, Mr. C. is also possessed of that character defect so frequently found in individuals of low intellectual calibre: he is enormously suggestible. Thus, lacking in the capacity for sufficient critical judgment, his manner of thinking, his pattern of living and his way of behaving can all easily be influenced by those persons closest to him. . . ."

[73] Timely question was raised at trial concerning the voluntariness of each of Culombe's Wednesday confessions, and both were found voluntary by the Connecticut court. The petition for certiorari in this Court adverts among the questions presented only to the written, Wednesday-midnight confession. However, in view of the intimate connection between the afternoon and midnight confessions, we regard the petition as fairly comprising a claim that the oral confession, as well, is unconstitutionally tainted by coercion.

Consideration of the body of this Court's prior decisions which have found confessions coerced informs this conclusion. For although the question whether a particular criminal defendant's will has been overborne and broken is one, it deserves repetition, that must be decided on the peculiar, individual set of facts of his case, it is only by a close, relevant comparison of situations that standards which are solid and effectively enforceable—not doctrinaire or abstract—can be evolved. In approaching these decisions, we may put aside at the outset cases involving physical brutality,[74] threats of physical brutality,[75] and such convincingly terror-arousing, and otherwise unexplainable, incidents of interrogation as the removal of prisoners from jail at night for questioning in secluded places,[76] the shuttling of prisoners from jail to jail, at distances from their homes, for questioning,[77] the keeping of prisoners unclothed or standing on their feet for long periods during questioning.[78] No such obvious, crude devices appear in this record. We may put aside also cases where deprivation of sleep has been used to sap a prisoner's strength and drug him[79] or where bald disregard of his rudimentary need for food is a factor that adds to enfeeblement.[80] Culombe was not subject to wakes or starvation. We may put aside cases stamped

---

[74] *Brown* v. *Mississippi,* 297 U. S. 278; cf. *Ward* v. *Texas,* 316 U. S. 547. And see *Pennsylvania ex rel. Herman* v. *Claudy,* 350 U. S. 116.

[75] Cf. *Malinski* v. *New York,* 324 U. S. 401. And see *Lee* v. *Mississippi,* 332 U. S. 742.

[76] *White* v. *Texas,* 310 U. S. 530; *Vernon* v. *Alabama,* 313 U. S. 547.

[77] *Ward* v. *Texas,* 316 U. S. 547.

[78] *Malinski* v. *New York,* 324 U. S. 401; *Lomax* v. *Texas,* 313 U. S. 544.

[79] *Chambers* v. *Florida,* 309 U. S. 227; *Leyra* v. *Denno,* 347 U. S. 556.

[80] *Payne* v. *Arkansas,* 356 U. S. 560.

with the overhanging threat of the lynch mob,[81] for although it is true that Culombe saw crowds of people gathered to witness his booking and presentation in New Britain, this circumstance must be accounted of small significance here. There were no mobs at Hartford where he was held securely imprisoned at State Police Headquarters.[82] Finally, we may put aside cases of gruelling, intensely unrelaxing questioning over protracted periods.[83] Culombe's most extended session prior to his first confession ran three and a half hours with substantial respites. Because all of his questioning concerned not one but several offenses, it does not present an aspect of relentless, constantly repeated probing designed to break concentrated resistance. Particularly, the sustained four-and-a-half-hour interview that preceded the Wednesday-midnight confession was almost wholly taken up with matters other than Kurp's, and at that time, far from resisting, Culombe was wholly cooperating with the police.

Similarly, our decisions in *Haley* v. *Ohio,* 332 U. S. 596, and *Blackburn* v. *Alabama,* 361 U. S. 199, are not persua-

---

[81] *Chambers* v. *Florida,* 309 U. S. 227; *Payne* v. *Arkansas,* 356 U. S. 560.

[82] Cf. *Thomas* v. *Arizona,* 356 U. S. 390.

[83] *Ashcraft* v. *Tennessee,* 322 U. S. 143 (relay questioning for more than thirty-six hours with one five-minute pause); *Watts* v. *Indiana,* 338 U. S. 49 (relay questioning from 11:30 p. m. to 2:30 or 3 a. m. on the first day of detention and from 5:30 p. m. to 3 a. m. on four of the five succeeding days); *Harris* v. *South Carolina,* 338 U. S. 68 (relay questioning in a hot cubicle throughout one evening and during eleven and a half hours, with a one-hour respite, the next day; then, on the day following, more than a half-dozen hours of questioning before the confession was made); *Leyra* v. *Denno,* 347 U. S. 556 (questioning throughout afternoon and evening on the first day; 10 a. m. to midnight on the second; then from 9 a. m. on the third until 8:30 a. m. on the morning of the fourth, with the questioning later resuming, after a brief recess, until Leyra confessed). Cf. *Chambers* v. *Florida,* 309 U. S. 227. But see *Lisenba* v. *California,* 314 U. S. 219.

sive here. Haley, a fifteen-year-old boy, was arrested at his home and taken to a police station at midnight, where he was questioned by relays of officers until he confessed at 5 a. m. He had seen no friend or legal counsel during that time and he was subsequently held incommunicado for three days. On the totality of circumstances, the Court held his confession coerced. But Culombe was never questioned concerning one crime for five hours. Indeed, he was never questioned during five hours at a stretch. He was never questioned in the early morning hours. And while Haley, whose questioning began immediately on his arrival at the station and did not let up until he confessed, had every reason to expect that his relay interrogators intended to keep the pace up till he broke,[84] Culombe, at the time of his confessions, had been questioned on several previous days and knew that the sessions had not run more than a few hours. Moreover, Culombe, despite his mental age of nine or nine and a half, cannot be viewed as a child. Expert testimony in the record, which the Connecticut courts may have credited, precludes the application to Culombe of standards appropriate to the adolescent Haley.

Nor, without guessing, as untutored laymen and not professionally informed as judges, about the susceptibility of a mental defective to overreaching, can we apply to Culombe the standards controlling the case of the active psychotic, Blackburn. The expert evidence of hallucinations, delusional ideas and complete loss of contact with his surroundings which we found uncontradicted in the *Blackburn* record has no counterpart in Culombe's. Also, Blackburn, like Haley, confessed after a protracted questioning session—eight or nine hours, with a one-hour break, in Blackburn's case—more exhausting than any single period that Culombe underwent.

[84] See also *Spano* v. *New York*, 360 U. S. 315.

On the other hand, what must enter our judgment about Culombe's mental equipment—that he is suggestible and subject to intimidation—does not permit us to attribute to him powers of resistance comparable to those which the Court found possessed by the defendant Cooper in *Stein* v. *New York,* 346 U. S. 156, who haggled for terms with the officials to whom he confessed,[85] or the defendant James in *Lisenba* v. *California,* 314 U. S. 219, who bragged immediately before his confession that there were not enough men in the District Attorney's office to make him talk. Culombe was detained in the effective custody of the police for four nights and a substantial portion of five days before he confessed. During that time he was questioned so repeatedly, although intermittently, that he cannot but have been made to believe what the police hardly denied, that the police wanted answers and were determined to get them.[86] Other than

[85] The defendant Stein, like Cooper, was "an experienced criminal. . . . These men were not young, soft, ignorant or timid." 346 U. S., at 185. Although Culombe, too, has had considerable criminal experience, its value to him, as a school for toughening his resistance, must be duly discounted in light of his subnormal mental capacities. The testimony of a psychiatric expert for the prosecution is that "as a mental defective he is suggestible. I don't think that he is a fearful man. I think that he can be intimidated, and to use his own expression 'I don't have the Moxie that someone else has.'. . . He is suggestible and he can be intimidated. . . . I would say this—with benevolent influences, he gets along, as I said he did in the last three and a half years. With sufficiently intimidating malignant influences, he doesn't."

[86] Compare *Thomas* v. *Arizona,* 356 U. S. 390 (confession before justice of the peace at preliminary hearing on morning following afternoon of defendant's arrest; defendant warned of his rights to counsel and to plead not guilty); *Ashdown* v. *Utah,* 357 U. S. 426 (defendant cautioned that she can refuse to answer and can consult with counsel); *Brown* v. *Allen,* 344 U. S. 443 (defendant repeatedly warned that he can remain silent and have assistance of counsel; whenever defendant told police that he wanted to stop the conversation his request was respected and he was returned to jail).

his questioners and jailers and the police officials who booked him at New Britain, he spoke to only two people: Taborsky, of whom he was afraid, and his own wife, who, by prearrangement with Lieutenant Rome, asked him to tell the police the truth.[87]   The very duration of such a detention distinguishes this case from those in which we have found to be voluntary confessions given after several hours questioning·or less on the day of arrest.   See *Stroble* v. *California,* 343 U. S. 181; *Cicenia* v. *Lagay,* 357 U. S. 504; *Ashdown* v. *Utah,* 357 U. S. 426; cf. *Crooker* v. *California,* 357 U. S. 433.   In other cases, in which we have sustained convictions resting on confessions made after prolonged detention, questioning of the defendant was sporadic, not systematic,[88] or had been discontin-

---

[87] Compare *Brown* v. *Allen,* 344 U. S. 443 (defendant saw counsel and at least two friends during detention, one of whom was located by police at his request; it is true that one of these friends appears to have been coöperating with the police in certain regards, but there is no indication that she attempted to persuade the prisoner to confess) ; *Lyons* v. *Oklahoma,* 322 U. S. 596 (defendant's wife and family visited him in jail).

[88] In *Gallegos* v. *Nebraska,* 342 U. S. 55, the defendant was arrested in Texas by Texas authorities and, when questioned, gave a false name.   He was held in custody and again questioned—after intervals first of twenty-one, then of forty-eight hours—for the purpose of establishing his identity.   On the second occasion, he gave his name and admitted that he had been in Nebraska.   On the following day, he confessed to a crime committed in that State.   He was removed to Nebraska and during his first questioning by Nebraska officers, a week after his Texas confession, he again confessed.   No claim of coercion was pressed in this Court in *Gallegos,* counsel for the petitioner relying on the fact of illegally prolonged detention without preliminary examination and before appointment of counsel.   In *Lyons* v. *Oklahoma,* 322 U. S. 596, the defendant was questioned for two hours on the day of his arrest, then remained in jail (where his family visited him) for eleven days.   At the end of this period he was subjected to one prolonged, night-long interrogation session under intimidating circumstances and he confessed.   This confession was not offered in evidence, having concededly been coerced.   He con-

ued during a considerable period prior to confession,[89] so that we did not find, in the circumstances there presented, that police interrogators had overborne the accused.

The cases most closely comparable to the present one on their facts are *Turner* v. *Pennsylvania,* 338 U. S. 62, *Johnson* v. *Pennsylvania,* 340 U. S. 881, and *Fikes* v. *Alabama,* 352 U. S. 191. Turner, like Culombe, was arrested without a warrant and, without having been brought before a magistrate,[90] was detained during four nights and about five days before he confessed. Like Culombe, also, he was questioned in daylight and evening hours, sometimes by one, sometimes by several officers. Turner

---

fessed again the same evening, after he had been taken to the state penitentiary and delivered into custody of the warden; and the question raised was whether the coercive influences attending the initial confession also infected the later one. The whole pattern of factors in *Lyons* was different from that of the present case and involved wholly different considerations. Cf. *United States* v. *Bayer,* 331 U. S. 532. And see *Wilson* v. *Louisiana,* 341 U. S. 901 (defendant had been interrogated during four or five hours following his arrest and confessed; two days later he was asked to repeat his story and he again confessed, there being no indication in the record that he was questioned on the second occasion).

[89] In *Brown* v. *Allen,* 344 U. S. 443, the defendant had been arrested on Monday, twice questioned for an hour or two on that day, and questioned daily for a couple of hours on Tuesday and Wednesday. On Thursday he was confronted by witnesses and, after they had related certain information, he was asked whether he had any questions to ask them. On each occasion he was warned that he need make no statement and that he had a right to the assistance of counsel before he made any statement. He was not again interviewed until the following Saturday, when the charges against him were read to him, he was asked if he wanted to make a statement, and—without questioning—he confessed. See also note 87, *supra.*

[90] Culombe's appearance before the New Britain Police Court, whether or not it legitimated his detention under Connecticut law, hardly afforded him the protection of a preliminary examination with respect to the felonies of which he was suspected. See p. 632, *infra.*

saw no visitors during his detention; Culombe saw only
his wife, who gave him scant support. It is true that
Turner's interrogation amounted to a total of more than
twenty-three hours, as against the approximately twelve
and one half hours that Culombe was questioned prior to
his first confession, and that Turner was questioned on
two days for as many as six hours (in two sessions, on
each occasion), while Culombe was never questioned for
more than three hours on any one day. It is true also
that Turner's questioning involved only a single crime,
not several. But Turner was not a mental defective, as
is Culombe, and certain significant pressures brought to
bear on Culombe—the use of his family, the intimidating
effect of the New Britain Police Court hearing—were
absent in the *Turner* record. The Court held Turner's
confession coerced.

Johnson, indicted as Turner's accomplice, was detained
during approximately the same period and under the same
conditions as was Turner. He was questioned, however,
for only somewhat more than six hours over these five
days, never more than an hour and a half at a sitting. At
least five officers participated, at one time or another, in
the questioning. At his separate trial, both his own con-
fession and Turner's were admitted. This Court reversed
*per curiam.*[91]

The facts on which the Court relied in *Fikes* were these.
The defendant, a twenty-seven-year-old Negro with a
third-grade education, apparently schizophrenic and
highly suggestible, and who had previously been involved
with the law on only one occasion, was apprehended by
private persons in a white neighborhood in Selma, Ala-
bama, at midnight on a Saturday. Jailed and held by the

---

[91] Without entering into further discussion of this admittedly not
unambiguous decision, one may draw from it, at the least, a reffirm-
ance of what was decided in *Turner*.

police on open charges, he was questioned for four and a half or five hours in two sessions on Sunday, and during the second of these sessions he was driven around the city to the locations of several unsolved burglaries. That day he talked to the sheriff of his home county, called to Selma at his request. On Monday he talked to his employer. After two hours of questioning in the morning he was taken to a state prison fifty-five miles from Selma and eighty miles from his home, where he was questioned during several hours in the afternoon and a short while in the evening. Thereafter, he was kept in a segregation unit at the prison, where he saw only jailers and police officers. He did not consult counsel, nor was he brought before a magistrate—despite the requirement of Alabama law that he be taken forthwith for a magistrate's hearing—prior to the time of his confession.

On Tuesday he was not questioned. On Wednesday he was questioned several hours in the afternoon and into the evening. On Thursday the questioning totaled three and a half hours in two sessions, and on that day his father, who had come to the prison to see him, was turned away. Thursday evening his first confession, consisting largely of yes-and-no answers to often leading or suggestive questions by an examiner, was taken. Saturday he was questioned again for three hours. A lawyer who came to the prison to see him was refused admission. On Sunday, however, Fikes' father was permitted to see him. The following Tuesday, after questioning of two and a half hours, he confessed a second time. Both confessions were admitted in evidence at his trial.

This Court reversed Fikes' conviction. That reversal was on a record which showed, as does Culombe's, only intermittent interrogation and no total denial of friendly communication to the prisoner. It showed also, as does the present record, a background atmosphere of community outrage but no appreciable threat of lynch violence.

Particularly significant, Fikes, like Culombe, was suspected not of only one, but of a number of offenses under investigation. Fikes, concededly, was removed to a prison located at a considerable distance from his home, as Culombe was not. This is a factor to be considered. But in *Fikes* that removal was purportedly—and not unconvincingly—justified by concern for the prisoner's safety, compare *Ward* v. *Texas,* 316 U. S. 547, and was not, as such, a predominant element in our decision.

We find that the present case is not less strong for reversal than *Fikes* v. *Alabama.* Culombe—certainly not a stronger man than Fikes—was apparently never informed of his constitutional rights, as was Fikes. Nevertheless, he expressly told the police that he wanted counsel, as Fikes did not, and his request was in effect frustrated. We are told that this was because Culombe did not know the name of any particular attorney and the police do not regard it as an appropriate practice for them to suggest attorneys' names to prisoners. However laudable this policy may be in the general run of things, it manifests an excess of police delicacy when a totally illiterate man, detained at police headquarters and suspected of many serious felonies, obviously needs a lawyer and asks for one. In any event, in every county in Connecticut there is a public defender.[92]

Moreover, Culombe was subjected to other pressures not brought to bear on Fikes. By Lieutenant Rome's arrangement, Mrs. Culombe was permitted—indeed asked—to confront her husband and tell him to confess. Culombe's thirteen-year-old daughter was called upon in his presence to recount incriminating circumstances. This may fall short of the crude chicanery of employing persons intimate with an accused, to play on his emotions,

---

[92] Conn. Gen. Stat., 1949, § 8796, now Conn. Gen. Stat., 1958, § 54–80.

that was involved in *Spano* v. *New York*, 360 U. S. 315. But it appears, in conjunction with all of the other circumstances, to have had precisely the effect that Rome, by his own admission, calculated: "it is another way of getting a confession." [93]

What appears in this case, then, is this. Culombe was taken by the police and held in the carefully controlled environment of police custody for more than four days before he confessed. During that time he was questioned—questioned every day about the Kurp's affair—and with the avowed intention, not merely to check his story to ascertain whether there was cause to charge him, but to obtain a confession if a confession was obtainable.

All means found fit were employed to this end. Culombe was not told that he had a right to remain silent. Although he said that he wanted a lawyer, the police made no attempt to give him the help he needed to get one.[94] Instead of bringing him before a magistrate with

---

[93] We have duly taken into account, in this regard, the finding by the Connecticut Superior Court: "Nothing was said or done by the police to Mrs. Culombe or the children to cause anxiety on the part of Culombe or to reduce his resistance or will power, or to influence him to confess." Whatever was done *to* Mrs. Culombe, it is what was done *with* her, and *with* her daughter, that is significant. To the extent that this finding can be read—as we think it cannot—to mean that no use was made of Culombe's family which in fact reduced his resistance, such a finding would lack support in evidence. *Thompson* v. *Louisville*, 362 U. S. 199. It is the uncontroverted testimony of both Rome and Paige that Culombe was upset by his wife's visit of Tuesday night, and Paige testified that Culombe thereafter choked up or sobbed.

[94] We do not ignore that Culombe never repeated his request for a lawyer after Saturday night. In view of its frustration at that time, this is not surprising. Lieutenant Rome told him on Tuesday morning that he would have a chance to consult counsel at court—a promise that was not made good.

It is also true that Culombe several times saw his wife, at home and at State Police Headquarters, and that he did not request that

reasonable promptness, as Connecticut law requires, to be duly presented for the grave crimes of which he was in fact suspected (and for which he had been arrested under the felony-arrest statute), he was taken before the New Britain Police Court on the palpable ruse of a breach-of-the-peace charge concocted to give the police time to pursue their investigation. This device is admitted. It had a two-fold effect. First, it kept Culombe in police hands without any of the protections that a proper magistrate's hearing would have assured him. Certainly, had he been brought before it charged with murder instead of an insignificant misdemeanor, no court would have failed to warn Culombe of his rights and arrange for appointment of counsel.[95] Second, every circumstance of the Police Court's procedure was, in itself, potentially intimidating. Culombe had been told that morning that

she secure an attorney for him. Under the stressing circumstances of these meetings, such reserve of thought can hardly have been expected. Culombe's own explanation for his failure to make this request of his wife is that which the circumstances, even without his testimony, compel: "I didn't ask her. I didn't even think of it, to begin with . . . . How could you, with all this pressure? You don't even know what day it is half the time."

[95] In *Rex* v. *Dick*, [1947] 2 D. L. R. 213, certain statements made by a prisoner who had been charged with vagrancy, cautioned concerning that offense (or not at all), and then questioned with the purpose of eliciting information about the murder of which she was suspected, were held inadmissible as involuntary. Robertson, C. J. O., said, at 225:

". . . It seems to me to be an abuse of the process of the criminal law to use the purely formal charge of a trifling offence upon which there is no real intention to proceed, as a cover for putting the person charged under arrest, and obtaining from that person incriminating statements, not in relation to the charge laid and made the subject of a caution, but in relation to a more serious and altogether different offence: . . . It is trifling with the long-established maxim *nemo tenetur seipsum accusare,* and has more than the mere appearance—but, in the intended result it has at times the effect—of a trial by the police *in camera* before even the charge has been laid."

he would be presented in a court of law and would be able to consult counsel. Instead, he was led into a crowded room, penned in a corner, and, without ever being brought before the bench or given a chance to participate in any way, his case was disposed of. Culombe had been convicted of crimes before and presumably was not ignorant of the way in which justice is regularly done. It would deny the impact of experience to believe that the impression which even his limited mind drew from this appearance before a court which did not even hear him, a court which may well have appeared a mere tool in the hands of the police, was not intimidating.

That same evening, by arrangement of the State Police, Culombe's wife and daughter appeared at Headquarters for the interview that left him sobbing in his cell. The next morning, although the mittimus of the New Britain Police Court had committed Culombe to the Hartford Jail until released by due course of law, the police "borrowed" him, and later the questioning resumed. There can be no doubt of its purpose at this time. For Paige then "knew"—if he was ever to know—that Culombe was guilty.[96] Paige opened by telling Culombe to stop lying

---

[96] On the basis of the following testimony by Sergeant Paige on cross-examination, it would be difficult to regard Wednesday's questioning of Culombe as anything other than a pile-driving effort to force his conviction from his own lips:

"Q. How long did he continue to say that? A. Well, I started talking to him at one-thirty and it was just a short while afterwards that I took this piece of paper with all the different crimes on it and asked him these questions. Murphy came in and repeated the same thing and we were out of the barracks by half past three that afternoon.

"Q. Well, how long did he keep that up—saying he didn't want to talk about it? A. Everytime we would ask him a question and ask him if he was there and he would say he didn't want to talk about it.

and to say instead that he did not want to answer. But when Culombe said that he did not want to answer, Detective Murphy took over and repeated the same questions that Paige had asked.

It is clear that this man's will was broken Wednesday afternoon. It is no less clear that his will was broken Wednesday night when, after several hours in a car with four policemen, two interviews with his wife and his apparently ill child, further inquiries made of him in the presence of the Police Commissioner, and a four-and-a-half-hour session which left him (by police testimony) "tired," he agreed to the composition of a statement that was not even cast in his own words. We do not overlook the fact that Culombe told his wife at their apartment that he wanted to cleanse his conscience and make a clean breast of things. This item, in the total context, does not overbalance the significance of all else, particularly since it was his wife who the day before, at the request of

---

"Q. How long a period of time did that take to give that answer? A. What answer?

"Q. 'I don't want to talk about it'? A. Three quarters of an hour.

"Q. And he had been doing that in addition to denying it for days up to that point, hadn't he? A. Well, that wasn't a denial, Mr. McDonough.

"Q. Well, he said he had nothing to do with them, didn't he? A. No, he said rather than lie—he said 'I don't want to talk about it,' which was telling me that he was involved in the crimes.

"Q. That was your conclusion? A. That was the conclusion between us.

"Q. He never said any such thing that you just said—that is a conclusion of yours—that is what you are assuming? A. That is what I knew.

"Q. That is what you knew he was involved in—he didn't tell you he was involved in any of those crimes? A. But I knew that was the answer without his actually saying yes.

"Q. Isn't that an assumption you drew? A. That was the knowledge I received from his acts.

"Q. That is what you drew? A. Yes."

Lieutenant Rome, had asked him to confess.[97]  Neither the Wednesday-afternoon nor the Wednesday-midnight statement may be proved against Culombe, and he convicted by their use, consistently with the Constitution.

## VII.

Regardful as one must be of the problems of crime-detection confronting the States, one does not reach the result here as an easy decision.  In the case of such unwitnessed crimes as the Kurp's killings, the trails of detection challenge the most imaginative capacities of law enforcement officers.  Often there is little else the police can do than interrogate suspects as an indispensable part of criminal investigation.  But when interrogation of a prisoner is so long continued, with such a purpose, and under such circumstances, as to make the whole proceeding an effective instrument for extorting an unwilling admission of guilt, due process precludes the use of the confession thus obtained.  Under our accusatorial system, such an exploitation of interrogation, whatever its usefulness, is not a permissible substitute for judicial trial.

*Reversed.*

MR. CHIEF JUSTICE WARREN, concurring.

It has not been the custom of the Court, in deciding the cases which come before it, to write lengthy and abstract dissertations upon questions which are neither pre-

---

[97] We accord small weight, also, to the fact that on Thursday, when Culombe was presented in the Superior Court for murder, he told the presiding judge that he wanted to cooperate with the police and was willing to be released into their custody.  Of course, if Culombe's sole claim of coercion were that he had been physically abused at State Police Headquarters, such behavior on his part might ground a reasonable inference that assertions of brutality were not credible. But the pressures of which he complains, and in which we sustain him, are of a subtler sort, and nothing in his willingness to "cooperate"—on the day after he signed a series of confessions—is inconsistent with the conclusion that those pressures broke his resistance.

sented by the record nor necessary to a proper disposition of the issues raised. The opinion which announces the judgment of the Court in the instant case has departed from this custom and is in the nature of an advisory opinion, for it attempts to resolve with finality many difficult problems which are at best only tangentially involved here. The opinion was unquestionably written with the intention of clarifying these problems and of establishing a set of principles which could be easily applied in any coerced-confession situation. However, it is doubtful that such will be the result, for while three members of the Court agree to the general principles enunciated by the opinion, they construe those principles as requiring a result in this case exactly the opposite from that reached by the author of the opinion. This being true, it cannot be assumed that the lower courts and law enforcement agencies will receive better guidance from the treatise for which this case seems to have provided a vehicle. On an abstract level, I find myself in agreement with some portions of the opinion and in disagreement with other portions. However, I would prefer not to write on many of the difficult questions which the opinion discusses until the facts of a particular case make such writing necessary. In my view, the reasons which have compelled the Court to develop the law on a case-by-case approach, to declare legal principles only in the context of specific factual situations, and to avoid expounding more than is necessary for the decision of a given case are persuasive. See *Alabama State Federation of Labor* v. *McAdory*, 325 U. S. 450, 461–462, and cases cited; *Poe* v. *Ullman, ante*, p. 497. I see no reason for making an exception in this case, and I am therefore unable to join the opinion which announces the judgment of the Court. Accordingly, I join the separate concurring opinion of MR. JUSTICE BRENNAN.

Mr. JUSTICE DOUGLAS, with whom Mr. JUSTICE BLACK agrees, concurring.

I find this case a simple one. As my Brother BRENNAN states, it is controlled by many of our decisions concerning confessions unlawfully obtained. It is also controlled by the principle some of us have urged upon the Court in several prior cases, including *Crooker* v. *California,* 357 U. S. 433, 441 (dissenting opinion); *Ashdown* v. *Utah,* 357 U. S. 426, 431 (dissenting opinion); *Cicenia* v. *Lagay,* 357 U. S. 504, 511 (dissenting opinion); *Spano* v. *New York,* 360 U. S. 315, 324 (concurring opinion).[1] That principle is that any accused—whether rich or poor—has the right to consult a lawyer before talking with the police; and if he makes the request for a lawyer and it is refused, he is denied "the Assistance of Counsel for his defence" guaranteed by the Sixth and Fourteenth Amendments.

The police first descended on petitioner on a Saturday afternoon. By ten that night—at the latest—he was in "custody." He asked to see an attorney. That request was callously turned aside. The testimony of Officer Rome exposes the critical issue in the case:

> "Q. Up until Monday night Culombe hadn't seen a lawyer, had he? A. No, sir.
> "Q. He had asked to see a lawyer, hadn't he?
> "A. Yes, sir.
> "Q. Didn't you tell him that he could see a lawyer when you got good and ready to let him see him?
> "A. No, sir.
> "Q. Well, when he asked to see a lawyer did he see a lawyer? A. No, sir.

---

[1] Cf. *In re Oliver,* 333 U. S. 257; *In re Groban,* 352 U. S. 330, 337 (dissenting opinion); *Anonymous* v. *Baker,* 360 U. S. 287, 298 (dissenting opinion).

"Q. Did you allow him to go to a telephone to call a lawyer? A. There was a telephone right there. He didn't have the name of an attorney to call.

"Q. Well, there are a large number of Hartford lawyers' names in the Hartford telephone directory.

"A. Yes, sir.

"Q. Did you offer him the use of the directory to find out the name of a lawyer to call?

"A. We were told that he couldn't read.

"Q. Oh, you were told that he couldn't read?

"A. Yes, sir.

"Q. Who told you that? A. He did.

"Q. Well, then, before I asked the question here in the courtroom, you had information that he couldn't read?

"A. After I talked with him.

"Q. So, therefore, a telephone directory would have been of no use to him? That is what you mean by the answer? A. If what he told me was the truth, yes, sir.

"Q. Did you tell him that he could have gotten in touch with Mr. Cosgrove, the Public Defender for this court?

"A. I make it my business never to mention any attorneys. It is up to them to mention their attorney.

"Q. This man was in the hands of the police on a serious investigation. He said that he wanted a lawyer and you did nothing to help him? A. I told him he could have a lawyer if he told me who he wanted me to call.

"Q. Did you tell him that? A. Yes, sir.

"Q. Didn't Culombe tell you on Monday night, 'If that is the way you operate up here I want to get in touch with a lawyer,' and you replied, 'We will

let you get in touch with one at the right time, not until then.'

"A. No, sir.

"Q. But there was talk about a lawyer?  A. Yes, sir."

Petitioner is illiterate and mentally defective—a moron or an imbecile.  He spent six years in the third grade and left school at the age of sixteen.  He has twice been in state institutions for the feeble-minded.

He did not see an attorney until six days after he was first arrested and after he had confessed to the police.  During all this time the police questioned him until their questioning produced the confession on which his present conviction is based.

It is said that if we enforced the guarantee of counsel by allowing a person, who is arrested, to obtain legal advice before talking with the police, we "would effectively preclude police questioning" (*Crooker* v. *California, supra,* 441) and "would constrict state police activities in a manner that in many instances might impair their ability to solve difficult cases."  *Cicenia* v. *Lagay, supra,* 509.  It is said that "any lawyer worth his salt will tell the suspect in no uncertain terms to make no statement to police under any circumstances."  *Watts* v. *Indiana,* 338 U. S. 49, 57, 59 (concurring opinion).  In other words, an attorney is likely to inform his client, clearly and unequivocally, that "No person . . . shall be compelled in any criminal case to be a witness against himself," as provided in the Fifth Amendment.  This is the "evil" to be feared from contact between a police suspect and his lawyer.

Interrogation of people by the police is an indispensable aspect of criminal investigations.  But there is *no* right to interrogate—by the police any more than by the courts—when the privilege against self-incrimination is invoked.  Knowing this, the police have set up in its place a system of administrative detention that has no consti-

tutional justification. It is detention *incommunicado,* a system which breeds oppression. See *Haley* v. *Ohio,* 332 U. S. 596. In the present case this illiterate petitioner was not given the modicum of protection afforded in England where a prisoner is warned that statements made may be used against him [2] and where the police are enjoined not to hammer away at a prisoner nor even to cross-examine him when he makes a voluntary statement except to clear up ambiguities. See Devlin, The Criminal Prosecution in England (1958), pp. 137–141. The flow of cases coming here shows that detention *incommunicado* is often accompanied by illegality and brutality. The arrival of an attorney is a specific against these proscribed practices.

If this accused were a son of a wealthy or prominent person, and demanded a lawyer, can there be any doubt that his request would have been heeded? But petitioner has no social status. He comes from a lowly environment. No class or family is his ally. His helplessness before the police when he is without "the guiding hand of counsel" (*Powell* v. *Alabama,* 287 U. S. 45, 69) emphasizes the lack

[2] "The form of caution expresses two things. First, there is the reminder that the accused is not obliged to talk: secondly, there is the warning that, if he does talk, what he says will be taken down in writing and may be given in evidence. From the lawyer's point of view both are statements of the obvious. Just as an accused or suspect is never obliged to talk, so the police are always at liberty to take down what an accused or suspect says and give it in evidence. The real significance of the caution is that it is, so to speak, a declaration of war. By it the police announce that they are no longer representing themselves to the man they are questioning as the neutral inquirer whom the good citizen ought to assist; they are the prosecution and are without right, legal or moral, to further help from the accused; no man, innocent or guilty, need thereafter reproach himself for keeping silent, for that is what they have just told him he may do. The caution, the charge, the arrest—any of these three things show that hostilities have begun and that the suspect has formally become the accused." Devlin, The Criminal Prosecution in England (1958), pp. 36–37.

of equal protection inherent in the dwarfed and twisted construction we have given the constitutional guarantee of the assistance of counsel. Cf. *McNeal* v. *Culver*, 365 U. S. 109, 117 (concurring opinion).

The system of police interrogation under secret detention falls heaviest on the weak and illiterate—the least articulate segments of our society. See American Civil Liberties Union Report, Secret Detention by the Chicago Police (1959), pp. 19–21. The indigent who languishes in jail for want of bail, cf. *Bandy* v. *United States*, 81 S. Ct. 197 (memorandum opinion), or the member of a minority group without status or power [3] is the one who suffers most when we leave the constitutional right to counsel to the discretion of the police. That right can only be protected by a broad guarantee of counsel that applies across the board to rich and poor alike. See *Reck* v. *Pate, ante,* p. 444 (concurring opinion).

I believe that the denial of petitioner's request that he be given the right of counsel was a violation of his constitutional rights. I therefore concur in the judgment of the Court reversing the conviction.

MR. JUSTICE BRENNAN, with whom THE CHIEF JUSTICE and MR. JUSTICE BLACK join, concurring in the result.

It is my view that the facts stated in Part V of the opinion of my Brother FRANKFURTER require the con-

---

[3] "Police officers are charged with the fair and impartial administration of the law. Yet, in many localities, there are sharp and shocking contrasts in the kind of 'law' administered to different groups of citizens. . . . [P]eople lacking special status or 'pull' may be pushed around, roughed up, arrested on vague and even false charges, and treated generally as second-class citizens. This is especially true of dwellers in slum areas with high crime rates—and even more especially of poverty-ridden Negroes and other minority groups—where police raids on tenement homes are sometimes made on slight suspicion without the benefit of search warrants." Deutsch, The Trouble with Cops (1955), p. 63.

clusion that all and not alone the Wednesday confessions were coerced from the petitioner, and that under our cases none is admissible in evidence against him. See, *e. g., Fikes* v. *Alabama,* 352 U. S. 191, and cases there cited.

MR. JUSTICE HARLAN, whom MR. JUSTICE CLARK and MR. JUSTICE WHITTAKER join, dissenting.

I agree to what my Brother FRANKFURTER has written in delineation of the general principles governing police interrogation of those suspected of, or under investigation in connection with, the commission of crime, and as to the factors which should guide federal judicial review of state action in this field. I think, however, that upon this record, which contains few of the hallmarks usually found in "coerced confession" cases, such considerations find their proper reflection in affirmance of this judgment.

With due regard to the medical and other evidence as to petitioner's history and subnormal mentality, I am unable to consider that it was constitutionally impermissible for the State to conclude that petitioner's "Wednesday" confessions were the product of a deliberate choice on his part to try to ameliorate his fate by making a clean breast of things, and not the consequence of improper police activity. To me, petitioner's supplemental confession on the following Saturday night, which as depicted by the record bears all the *indicia* of spontaneity, is especially persuasive against this Court's contrary view.

I should also add that I find no constitutional infirmity in the standards used by the Connecticut courts in evaluating the voluntariness of petitioner's confessions. Cf. *Rogers* v. *Richmond,* 365 U. S. 534.

I would affirm.